## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

---

NATIONAL ASSOCIATION OF
   CHAIN DRUG STORES;
   NATIONAL COMMUNITY
   PHARMACISTS ASSOCIATION;
   KLINGENSMITH DRUG INC.,
   KOPP DRUG, INC.; LECH'S
   PHARMACY, PJL PHARMACY,
   INC.; MJR, LTD.; MJRRX, INC.;
   DAVID M. SMITH RPH, INC.;
   PROFESSIONAL SPECIALIZED
   PHARMACIES, LLC; ANBAR,
   INC.; SELLERSVILLE
   PHARMACY, INC.; TEP, INC.;
   THOMPSON ENTERPRISES INC.;
   BROAD AVE PHARMACY LLC;
   HOLLIDAYSBURG PHARMACY
   LLC; VALUE DRUG COMPANY;
   and VALUE SPECIALTY
   PHARMACY LLC,

               Plaintiffs,

           v.                       Civil Action No.

                                      _____

EXPRESS SCRIPTS, INC.
   and MEDCO HEALTH
   SOLUTIONS, INC.

              Defendants.

---

## COMPLAINT

1.    The National Association of Chain Drug Stores ("NACDS"), the National

Community Pharmacists Association ("NCPA") (the "Associations"); Klingensmith Drug Inc.

("Klingensmith's"); Kopp Drug, Inc. ("Kopp Drug"); Lech's Pharmacy, PJL Pharmacy, Inc.,

MJR, Ltd., MJRRx, Inc. (collectively "Lech's Pharmacy Group"); David M. Smith RPh, Inc. ("Means Lauf Super Drug"); Professional Specialized Pharmacies, LLC ("Hometown Pharmacies"); Anbar, Inc. ("Skippack Pharmacy"), Sellersville Pharmacy, Inc.; TEP, Inc. ("Brighton Pharmacy"); Thompson Enterprises Inc., Broad Ave Pharmacy LLC, Hollidaysburg Pharmacy LLC (collectively "Thompson Pharmacy"); Value Drug Company, and Value Specialty Pharmacy LLC (collectively the "Plaintiffs"), by and through their undersigned counsel, bring this civil action to enjoin the proposed acquisition by Defendant Express Scripts, Inc. ("ESI") of Defendant Medco Health Solutions, Inc. ("Medco") (collectively "Defendants"). The Plaintiffs allege as follows:

## I. INTRODUCTION

2.      This is an antitrust case concerning the acquisition of Medco by ESI.  This acquisition would combine two of the three largest pharmacy benefits management companies ("PBMs") in the United States leaving only two significant competitors in a highly concentrated industry.  Such three-to-two mergers are consistently enjoined by courts.  Indeed, mergers in highly concentrated markets that dramatically increase market concentration, as this merger would, are presumptively illegal under U.S. antitrust laws.  If consummated, this merger would create a dominant entity with anticompetitive effects in the relevant markets for (a) the purchase of retail community pharmacy services; (b) the provision of Clinical Specialty Drugs; (c) the provision of full service, nationwide PBM services to large employers; and (d) the provision of drugs to beneficiaries of large employers.

3.      By exercising its substantial market power post-acquisition, this unrestrained PBM would be able to reduce the quality of prescription drug care provided to tens of millions of patients by reducing its prescription drug reimbursement to retail community "brick-and-mortar"

2

pharmacies to well below competitive levels and by forcing patients to use PBMs' proprietary mail-order and specialty pharmacies. As a result, plaintiffs—retail community pharmacies throughout the United States that provide critical services to millions of patients—are threatened with substantial, imminent and irreparable harm as a result of this acquisition.

4. The loss of competition in the relevant markets that would result from this acquisition would (a) reduce the quality of pharmacy services provided to patients and (b) raise patient's healthcare costs by increasing PBM fees and prices for prescription drugs. Many of these higher healthcare costs will be borne by the largest employers in the United States, as well as their employees and their employees' families. These anticompetitive effects violate the antitrust laws and require an injunction of the acquisition to protect pharmacies and consumers.

## II. Background

5. Plaintiffs—which include two pharmacy associations that collectively represent the vast majority of retail community pharmacies in the United States as well as individual retail community pharmacies, a specialty pharmacy, and a pharmacy wholesaler—have brought this case to preserve competition and to protect pharmacies from serious and irreparable injury that would result from the anticompetitive effects of the proposed acquisition.

6. For nearly two centuries, local pharmacies have been an essential part of the fabric of America—fabric that will be irreparably torn asunder by the merger of ESI and Medco. The corner drugstore is a quintessential American institution. The roots of American pharmacy date back to at least the 1820s with the founding of the Philadelphia College of Pharmacy (1821) and the Massachusetts College of Pharmacy (1823). Between 1820 and 1860 the traditional multipurpose drugstore became a ubiquitous feature of American cities and towns. Early drugstores typically featured general use articles, such as glass, paints, varnishes and oils, as well

as apothecaries—the antecedents to pharmacies. During the early 20th Century, the practice of pharmacy became a regulated profession as states imposed mandatory training and licensing requirements on pharmacists. By the 1950s, pharmacies expanded their roles from dispensing drugs to counseling and disseminating public health information. Education and training for pharmacists was greatly expanded in the 1990s to address the growing role of pharmacists as patient-centered healthcare providers. Indeed, pharmacists now complete a doctoral Pharm.D. degree that includes extensive didactic clinical preparation and a full year of hands-on practice experience.

7.      Pharmacies remain an integral part of most Americans' everyday lives. The modern retail community pharmacy and its highly trained pharmacists focus on dispensing medication and counseling patients regarding those medications (hereinafter "community pharmacy services"). Pharmacists are indispensable resources in the otherwise complicated and murky world of health and medication information. Indeed, their clinical expertise and presence in cities and towns across America make them invaluable to patients and to our healthcare system generally. As the nation's shortage of primary care physicians grows, which particularly affects access to care for patients in poor rural and urban areas, pharmacists in all 50 states are now authorized to provide patients with vital immunizations.[1] Retail community pharmacies are the most accessible healthcare providers in the nation, providing vital care in underserved inner city and rural areas and placing pharmacists on the frontline of healthcare.

---

[1] Health Resources and Services Administration, *Health Professional Shortage Areas & Medically Underserved Areas/Populations 2011*, available at http://bhpr.hrsa.gov/shortage/; *see also* National Conference of State Legislatures, *States Implementing Health Reform: Primary Care Workforce Webinar 2011*, available at http://www.ncsl.org/Portals/1/documents/health/PrimaryCarewebinar111.pdf.

8. Pharmacists at community pharmacies provide an important human safeguard against computer limitations in identifying dangerous drug interactions. In more complicated situations, such as post-hospitalization where patients often have multiple medication changes, computer-based intervention alone can be particularly insufficient. Indeed, pharmacists in community pharmacies are uniquely able to provide extensive patient education and follow-up. As a result, consumers have an extraordinarily high regard for their local pharmacist and rank the profession second only to nurses as the most trusted and ethical profession in America.[2]

9. Older consumers rely on their retail community pharmacies even more than the rest of America. Elderly populations present medication management challenges uniquely suited to the skills of pharmacists accessible in retail community pharmacies. Medicare beneficiaries with multiple chronic illnesses see an average of thirteen different physicians, fill fifty different prescriptions per year, account for 76 percent of all hospital admissions, and are 100 times more likely to have a preventable hospitalization than those with no chronic conditions. Serving these patients requires analysis beyond merely identifying direct drug conflicts—oftentimes calling for nuanced adjustments to drug regimens based on a particularized knowledge of the patient, a task for which computers are ill-suited.

10. In addition, most patients prefer pharmacy services from brick-and-mortar retail community pharmacies over less personal mail-order delivery of drugs. Even patients who are amenable to mail-order delivery do not want to be *forced* to fill prescriptions through the mail. As J.D. Power and Associates recently reported, customers forced by PBMs to use mail-order services "aren't loyal customers. They're hostages, and they don't like it."[3] Similarly, a recent

---

[2] Gallup, *Honesty/Ethics in Professions 2011*, available at http://www.gallup.com/poll/1654/honesty-ethics-professions.aspx.

[3] J.D. Power and Associates, *Drug Topics article* (Mar. 2010).

poll found that 82.5 percent of respondents disapproved of requiring patients to fill their prescriptions through out-of-state mail-order facilities.[4]

11.     When pharmacy benefits are restricted so as to eliminate patient choice for community pharmacies versus mail-order, patient convenience and medication adherence are adversely affected.[5] Forcing patients to use mandatory mail-order pharmacies and denying them access to their local community pharmacist even causes some patients to discontinue their prescription drug therapy prematurely,[6] and patients who fill maintenance prescriptions at a community pharmacy see a statistically significant increase in medication adherence rates when compared to mail-order patients.[7]

12.     Community pharmacy patients receive face-to-face medication therapy management services from pharmacists, in collaboration with prescribers, which not only improves clinical outcomes, but also lowers total health expenditures.[8] Medication therapy management from community pharmacists has even been shown to decrease drug costs for Medicare Part D patients, while patients receiving medication from a mail-order pharmacy saw unchanged drug costs.[9]

---

[4] Rosetta Stone Communications, 2012 poll of voters in Georgia (Feb. 2012).

[5] Journal of the American Pharmacists Association, *Revealed Preference for Community And Mail Service Pharmacy* (Jan/Feb 2011).

[6] The American Journal of Managed Care, *Adherence to Medication Under Mandatory and Voluntary Mail Benefit Designs* (July 2011).

[7] The American Journal of Managed Care, *Medication Adherence for 90-Day Quantities of Medication Dispensed Through Retail and Mail Order Pharmacies* (November 2011).

[8] Journal of the American Pharmacists Association, *Clinical and Economic Outcomes of Medication Therapy Management Services: The Minnesota Experience* (Mar/Apr 2008).

[9] Journal of the American Pharmacists Association, *Impact on Drug Cost and Use of Medicare Part D of Medication Therapy Management Services Delivered in 2007* (Nov/Dec 2009).

13.     Forcing patients to use the PBMs' proprietary mail-order and specialty pharmacies can also directly raise the costs of pharmacy services. PBMs negotiate payments from brand drug manufacturers in the form of "rebates" to promote branded drugs through mail-order and specialty channels. These branded drugs typically are more expensive than generic medications favored by retail community pharmacies. Because community retail pharmacies have a much higher generic dispensing rate than mail-order pharmacies, they also help control and reduce costs.

14.     While individual consumers were traditionally the primary buyers of pharmacy services, in recent years PBMs have become the primary buyers of pharmacy services (on behalf of plan sponsors and patients).

15.     PBMs administer prescription drug benefit programs for individual plan sponsors, such as HMO plans, self-insured employers, indemnity plans, labor union plans, and plans covering public employees. PBMs are responsible for processing prescription drug claims, maintaining drug formularies, contracting with pharmacies for pharmacy services, and reimbursing retail community pharmacies for dispensing prescription drugs and providing related professional services to patients. PBMs also sell drugs to plan sponsors through PBM-owned mail-order and specialty pharmacies. In addition, PBMs obtain payments (in the form of rebates and other compensation) from drug manufacturers in exchange for promoting the use of more expensive brand-name drugs.

16.     Defendants ESI and Medco are two of the "Big Three" PBMs that, along with CVS Caremark, Inc., collectively cover approximately 72 percent of privately insured lives in the United States. Moreover, for large employers, the Big Three cover approximately 90 percent of privately insured lives in the United States.

17.     The Big Three are the only companies with sufficient scale and breadth of service to serve the vast majority of large national pharmacy benefit plans. They are also the largest purchasers of pharmacy services by a wide margin.

18.     As Medco's CEO, David Snow, has publicly admitted, smaller competitors do not effectively compete with the Big Three:

> Q…just to follow up on the pricing question. I think, obviously, **everyone's always focused on your two primary competitors.** Are you seeing any behavioral changes from the smaller PBMs out there potentially getting more aggressive or has that behavior been kind of consistent as well? A. (Snow)...For the most part, I would tell you that …**I'm not seeing a lot of secondary PBMs in the mix at all. I'm really not.** You may see a name pop up here and there, but that's not really common at all.[10]

19.     A basic tenet of antitrust law and economics is that high market concentration weakens competitors' incentives to compete. Indeed, ESI's chairman, George Paz, publicly admitted that limited competition in this highly concentrated industry *already* permits ESI to grow profits without "getting crazy" (in other words, competing vigorously):

> I think we can continue to grow EBITDA. **We can continue to grow our profits without getting crazy in the marketplace by just competing on the clients that make sense.**[11]

20.     Medco's CEO has also publicly admitted that limited competition in the industry has not forced Medco to price "irresponsibly" (in other words, price aggressively):

> **There are many reasons why you should believe that the pricing environment will be responsible and stable,** and because there's no reward for irresponsibility on the pricing side, investors will hammer a company that is irresponsible relative to its pricing. You cannot win in a marketplace by pricing yourself out of profitability…. Have there been one-off examples of wow, that was aggressive?

---

[10] Bloomberg Transcript, Medco Q2 2010 Earnings Call, at 12 (July 22, 2010) (emphasis added).

[11] Final Transcript, ESRX- Q3 2010 Express Scripts, Inc. Earnings Conference Call, at 5 (Oct. 28, 2010) (emphasis added).

Sure, but there were strategic reasons to do so on a one-off basis, but when you in aggregate look at the volume of transactions that are occurring, it's been a very responsible industry and a very responsible environment each and every year. And I would say, there's no reason to believe that will change going forward.[12]

21.     Even smaller PBMs, such as Catalyst, agree that the industry is highly concentrated, and that the largest companies (the Big Three) have significant advantages over smaller rivals:

> **The industry is highly consolidated and dominated by a few large, profitable, well established companies with significant financial and marketing resources, purchasing power and other competitive advantages that we do not have.** Scale is a particularly important factor in negotiating prices with pharmacies and drug manufacturers.[13]

22.     "[G]etting crazy in the marketplace" is precisely what competitors do in a highly competitive market. Even before the proposed acquisition, ESI did not believe that such vigorous competition was necessary. If allowed to proceed, ESI's proposed acquisition of Medco would lessen competition and reduce pricing pressure by effectively creating a duopoly for patients and their employers (plan sponsors) and a duopsony in the purchasing of retail community pharmacy services.

23.     The merger of ESI and Medco will have dire consequences for retail community pharmacies and their patients. For community pharmacies, a duopsony means that they will be forced to sell their services to ESI-Medco regardless of the terms offered by the merged entity, which would have the power to (a) reduce reimbursements to community pharmacies, (b) drive consumers to their own mail-order and specialty pharmacies, (c) reduce output of community pharmacy services, (d) reduce competition between community pharmacies and PBMs in the

---

[12] Final Transcript, "Goldman Sachs Healthcare CEO Unscripted Conference," at 2, Jan. 6, 2011.

[13] Catalyst SEC Form 10-K for the fiscal year ended December 31, 2010 at 20 (emphasis added).

dispensing of certain drugs for which PBMs and community pharmacies are direct competitors, and (e) ultimately raise prices and reduce quality of services and choice for patients.

24.     For patients, the acquisition would mean that plan sponsors would have very few competitive options.  This would allow ESI-Medco to force plan sponsors to accept prescription plans that divert patients away from the face-to-face pharmacy services that patients prefer and receive from retail community pharmacies (and that improve their health outcomes and reduce overall healthcare costs) to ESI-Medco's proprietary mail-order facilities.  Similarly, the lack of competition in the provision of PBM services would allow ESI-Medco to force plan sponsors and patients to accept drug formularies weighted towards brand name drugs and expensive "specialty drugs" only offered by ESI-Medco's specialty pharmacies.  These harms to plan sponsors and patients also injure pharmacies that stand to lose business diverted from them to PBM-owned mail-order facilities and specialty pharmacies.

25.     The proposed acquisition will also exacerbate barriers to entry and expansion into the top tier of the PBM market and increase the likelihood that the remaining "Big Two" PBMs could substantially reduce competition through successful coordination.  The history of attempted, unsuccessful entry demonstrates the high barriers to entry in the relevant markets. For instance, both Aetna and Walgreens founded PBMs but ultimately divested these businesses. With its increased market power ESI will be able to raise barriers to entry, for example, through exclusivity arrangements over expensive specialty drugs.

26.     Prior to the proposed acquisition, ESI and Medco competed in the markets for the purchase of retail community pharmacy services; the provision of specialty pharmacy services; the provision of full-service, nationwide PBM services to large private employers; and the

provision of prescription drugs to beneficiaries of large private employers. Absent the proposed acquisition, ESI and Medco would continue to compete.

27.     For these reasons, as set forth and detailed below, the proposed acquisition violates Section 7 of the Clayton Act, 15 U.S.C. § 18. The Plaintiffs, therefore, seek injunctive relief preventing the consummation of the proposed acquisition.

### III. THE PARTIES

28.     The National Association of Chain Drug Stores is a trade association organized under the laws of Virginia, having its principal place of business at 413 North Lee Street, Alexandria, VA 22314. NACDS members are traditional community pharmacies, supermarkets, and mass merchants with pharmacies—from regional chains with four stores to national companies. Chains operate more than 40,000 pharmacies and employ more than 3.5 million persons, including 130,000 pharmacists. They fill over 2.6 billion prescriptions annually. In Pennsylvania, 29 NACDS members operate more than 1,850 community retail pharmacies. As established by Article II of the NACDS bylaws, two of the primary "purposes" of NACDS are "1. To promote and preserve the general welfare of the chain drug industry and of the consumers it serves" and "2. To monitor activities of legislative, regulatory, pharmacy, and special interest groups and to initiate appropriate action which best serves the general welfare of the chain industry."

29.     The National Community Pharmacists Association is a trade association organized and existing under the laws of the Commonwealth of Virginia, having its principal place of business at 100 Daingerfield Road, Alexandria, VA 22314. NCPA represents the pharmacist owners, managers, and employees of more than 23,000 independent community pharmacies across the United States. In Pennsylvania, NCPA represents more than 1,000

independent retail community pharmacies and has 597 NCPA members. As stated in its bylaws, the core mission of NCPA is "[t]o promote pharmacy as a profession and the role of the independent community pharmacy and pharmacist in the American concept of free enterprise by maintaining freedom of choice of pharmacy to all citizens of the nation."

30.     Together, NACDS and NCPA members include tens of thousands of retail community pharmacies nationwide.

31.     The Associations' members routinely contract with Defendants to provide a range of pharmacy services to Defendants' clients and their beneficiaries. The Big Three PBMs are the largest purchasers of retail pharmacy services from NCPA and NACDS members.

32.     Some Associations' members also purchase PBM services directly or indirectly from Defendants for benefits plans offered to the Associations' members' employees.

33.     Members of NACDS and NCPA also compete with Defendants' mail-order and specialty pharmacies in two ways. First, the Associations' members compete by offering through their retail community pharmacies many of the same drugs that the PBMs provide through their mail and specialty pharmacies. Second, the Associations' members compete by offering mail service/home delivery, and they own (or subcontract with) specialty pharmacies.

34.     NCPA and NACDS serve as plaintiffs on behalf of their respective non-conflicted members and in furtherance of the aforementioned goals and purposes of the two organizations.[14] The Associations have been authorized to bring this suit in accordance with their bylaws.

35.     Members of NACDS and NCPA will be irreparably harmed by the consummation of the proposed acquisition in their capacity as sellers of pharmacy services to Defendants,

---

[14] Some of the Associations' members have opted not to participate in this suit for various reasons. The Associations' bylaws permit them to bring suits on behalf of their members and in furtherance of their missions where certain members choose not to participate.

customers of PBM services, and as competitors against Defendants' mail-order and specialty pharmacies. NCPA and NACDS members would otherwise have standing to sue in their own right; the interests at stake are germane to the purposes of the NACDS and NCPA; and neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit.

36. Brighton Pharmacy ("Brighton") is an independent pharmacy in New Brighton, Pennsylvania serving patients from the cities of New Brighton, Beaver Falls, Rochester, and Freedom. Brighton annually reaches and average of 30,000 patients and fills approximately 115,000 prescriptions. In addition to filling prescriptions, Brighton also offers other vital pharmacy services that its patients have come to rely upon, including immunizations, counseling, and medication therapy management ("MTM").

37. The combined ESI-Medco would control 56 percent of Brighton's prescriptions. This is such a significant portion of prescriptions that if the combined firm adopted non-competitive, or even below-cost, prices for retail pharmacy services, Brighton would be forced to sign the contract anyway.

38. Further reductions in reimbursement rates resulting from the acquisition likely would force Brighton to reduce pharmacy hours; reduce or cut patient programs, including medication and wellness counseling; and possibly even close altogether. Thus, Brighton and its customers will be immediately and irreparably harmed by the acquisition.

39. Klingensmith is a member of both NACDS and NCPA. Klingensmith owns and operates eight retail community pharmacies in Pennsylvania, with locations in Ford City, Leechburg, Shelocta, Rimersburg, Kittanning, Numine, West Kittanning, and New Bethlehem. Klingensmith has been serving Pennsylvania customers since 1940, when J.H. Klingensmith

opened the original Ford City location. Klingensmith grew from its single location to its current eight locations under the original Ford location's pharmacist, Joe Cippel, who operated the business after Mr. Klingensmith retired in 1972. Mr. Cippel's three children all joined the family business and continue the proud traditions started by Messrs. Cippel and Klingensmith to "[t]ake time to listen to each patient, provide them with good advice about their medications, and serve them with honesty and kindness, because it's just the neighborly thing to do."

40.     In December 2011, ESI controlled 22.7 percent of Klingensmith prescriptions and Medco controlled 35.9 percent. If the proposed acquisition is consummated, ESI-Medco would control the majority (58.6 percent) of Klingensmith prescriptions.

41.     After recent reimbursement rate cuts by ESI, Klingensmith was forced to close three locations and lay off over twenty employees. Nonetheless, Klingensmith currently retains *some* negotiating power in its dealings with ESI and Medco.

42.     If Defendants consummate the proposed acquisition, Klingensmith will immediately lose its current negotiating leverage, forcing it to accept lower rates and seriously threatening the financial viability of the company. The merger would also significantly impact the quantity, quality, and range of pharmacy services Klingensmith pharmacies are able to provide to patients, thereby undermining hard-won goodwill among its customers and communities. Thus, Klingensmith and its customers will be immediately and irreparably harmed by the acquisition.

43.     Kopp Drug has ten stores across Pennsylvania through which it annually reaches approximately 60,000 patients and fills over 520,000 prescriptions. In addition to filling prescriptions, Kopp Drug also offers vital services that its patients have come to rely upon, including immunizations, patient counseling, and sponsoring community related health events.

14

44.     The combined ESI-Medco would control 56 percent all PBM revenue received by Kopp Drug pharmacies.  This is such a significant portion of prescriptions that if the combined firm adopted non-competitive, or even below-cost, prices for retail pharmacy services, Kopp Drug would be forced to sign the contract anyway.

45.     A combined ESI-Medco would significantly and immediately impact the quantity, quality, and range of pharmacy services Kopp Drug pharmacies are able to provide to patients, thereby undermining hard-won goodwill among its customers and communities.

46.     Further reductions in reimbursement rates as a result of the acquisition likely would force Kopp Drug to reduce pharmacy hours; reduce or cut patient programs, including medication and wellness counseling; and potentially close pharmacies or Kopp Drug's entire business.  Thus, Kopp Drug and its customers will be immediately and irreparably harmed by the acquisition.

47.     Lech's Pharmacy Group ("LPG") is an independent pharmacy group with five locations in Wyoming, Sullivan and Bradford counties, Pennsylvania.  LPG annually reaches tens of thousands of patients and fills over 213,000 prescriptions.  In addition to filling prescriptions, LPG also offers other vital pharmacy services that its patients have come to rely upon, including, but not limited to, home delivery of prescriptions and durable medical equipment, prescription management systems that ease the burden of medication administration and face-to-face direct consultation by a pharmacist.

48.     A combined ESI-Medco would control 28 percent of LPG's prescriptions.  While LPG currently retains *some* negotiating power in its dealings with the Big Three, ESI-Medco would control such a significant portion of LPG's prescriptions that if the combined firm adopted

non-competitive, or even below-cost, prices for retail pharmacy services, LPG would be forced to sign the contract anyway.

49.     A combined ESI-Medco would significantly and immediately impact the quantity, quality, and range of pharmacy services LPG is able to provide to patients, thereby undermining hard-won goodwill among its customers and communities.

50.     Further reductions in reimbursement rates as a result of this merger likely would force LPG to reduce hours of operation (thereby diminishing access in three counties and five communities in rural northeast Pennsylvania), and also reduce staff (affecting salary and benefits of our employees along with tax base consequences). The merger will lead to the distinct possibility that LPG will be forced to close pharmacies. Thus, LPG and its customers will be immediately and irreparably harmed by the acquisition.

51.     Means Lauf Super Drug ("Means Lauf") is an independent pharmacy in Brookville, Pennsylvania. Means Lauf fills over 85,000 prescriptions a year. In addition to filling prescriptions, Means Lauf also offers other vital pharmacy services that its patients have come to rely upon, including delivery service, immunizations and medication therapy management.

52.     A combined ESI-Medco would control 51.1 percent of Means Lauf's prescriptions. This is such a significant portion of prescriptions that if the combined firm adopted non-competitive, or even below-cost, prices for retail pharmacy services, Means Lauf would be forced to sign the contract anyway.

53.     A combined ESI-Medco would significantly and immediately impact the quantity, quality, and range of pharmacy services Means Lauf is able to provide to patients, thereby undermining hard-won goodwill among its customers and communities.

54.     Further reductions in reimbursement rates as a result of this merger likely will force Means Lauf to reduce pharmacy hours and reduce or cut patient programs, including medication and wellness counseling.  However, even if Means Lauf cut services such as delivery or reduced store hours and staffing, it would not be able to withstand the merger of ESI and Medco.  Thus, Means Lauf and its customers will be immediately and irreparably harmed by the acquisition.

55.     Professional Specialized Pharmacies, LLC ("Hometown Pharmacies") owns and operates five retail pharmacies across Western Pennsylvania, through which they reach 7000 different patients monthly and fill over 20,000 prescriptions monthly.  In addition to filling prescriptions, Hometown Pharmacies also offers other vital pharmacy services that its patients have come to rely upon, including home delivery, community wellness programs, flu shot programs and rxmap, a compliance based medication packaging option.

56.     A combined ESI-Medco would control approximately 60 percent of prescriptions filled in Hometown Pharmacies.  This is such a significant portion of prescriptions that if the combined PBM adopted non-competitive, or even below-cost, prices for retail pharmacy services, Hometown Pharmacies would be forced to sign the contract anyway or risk losing access to a tremendous share of its customer base.

57.     A combined ESI-Medco would significantly and immediately impact the quantity, quality, and range of pharmacy services Hometown Pharmacies is able to provide to patients, thereby undermining hard-won goodwill among its customers and communities.

58.     Further reductions in reimbursement rates as a result of the merger likely would force Hometown Pharmacies to reduce pharmacy hours; reduce or cut pharmacy services and patient programs, including medication and wellness counseling; and possibly close pharmacies

or Hometown Pharmacies' entire business. In fact, Hometown Pharmacies has closed two separate stores in the past 18 months primarily due to pressures related to poor and even below-cost reimbursements from PBMs. Thus, Hometown Pharmacies and its customers will be immediately and irreparably harmed by the acquisition.

59.     Skippack Pharmacy ("Skippack") and Sellersville ("Sellersville") Pharmacy are independent pharmacies located in Skippack and Sellersville, Pennsylvania, respectively. The two pharmacies share common ownership. Together, Skippack and Sellerville annually reach 6,000 patients and fill over 160,000 prescriptions. In addition to filling prescriptions, Skippack and Sellersville also offer other vital pharmacy services that its patients have come to rely upon, including patient counseling, compliance packaging for both the vision and memory impaired, home delivery of medications, medication therapy management ("MTM"), vaccinations, and medication adherence programs.

60.     A combined ESI-Medco would control approximately 40 percent of Skippack's and Sellersville's prescriptions. This is such a significant portion of prescriptions that if the combined firm adopted non-competitive, or even below-cost, prices for retail pharmacy services, the pharmacies would be forced to sign the contract anyway.

61.     A combined ESI-Medco would significantly and immediately impact the quantity, quality, and range of pharmacy services Skippack and Sellersville are able to provide to patients, thereby undermining hard-won goodwill among their customers and communities.

62.     Further reductions in reimbursement rates as a result of this merger likely would force Skippack and Sellersville to reduce pharmacy hours; reduce or cut patient programs, including medication and wellness counseling; and possibly close altogether. Thus, the two pharmacies and their customers will be immediately and irreparably harmed by the acquisition.

63. Thompson Pharmacy owns four retail community pharmacies across Pennsylvania through which they annually reach 7,000 patients and fill over 260,000 prescriptions. In addition to filling prescriptions, Thompson Pharmacy also offers other vital pharmacy services that their patients have come to rely upon, including vaccines, consulting, and valuable patient education programs

64. A combined ESI-Medco would control 39 percent of non-Medicaid retail prescription sales by Thompson Pharmacy. This percentage would be higher if Pennsylvania Medicaid Managed Care retail prescription sales were included. This is such a significant portion of prescriptions sales that if the combined firm adopted non-competitive, or even below-cost, prices for retail pharmacy services, Thompson Pharmacy would be forced to sign the contract anyway.

65. The merger of ESI and Medco would also significantly and immediately impact the quantity, quality, and range of pharmacy services Thompson Pharmacy is able to provide to patients, thereby undermining hard-won goodwill among its customers and communities.

66. Further reductions in reimbursement rates likely would force Thompson Pharmacy to reduce pharmacy hours; reduce or cut patient programs including medication and wellness counseling; stop home delivery service to the elderly; reduce staff; and possibly even close individual pharmacies or the entire business of Thompson Pharmacy. Thus, Thompson Pharmacy and its customers will be immediately and irreparably harmed by the acquisition.

67. Value Drug Company is the parent of Value Specialty Pharmacy, LLC. Value Specialty Pharmacy services a patient base in seven states in support of nearly 600 independent community pharmacies. In addition to filling prescriptions, Value Specialty Pharmacy also offers vital services that its patients have come to rely upon, including patient reimbursement

assistance, clinical services, patient adherence and compliance activities, and patient reimbursement assistance.

68.     Value Specialty Pharmacy dispenses Clinical Specialty Drugs which are drugs that require specialized storage, control and security, handling, administration, and patient monitoring to achieve successful clinical outcomes.

69.     A combined ESI-Medco would control approximately 50 percent of Value Specialty Pharmacy's prescriptions. This is such a significant portion of prescriptions that if the combined firm adopted non-competitive, or even below-cost, prices for specialty pharmacy services, Value Specialty Pharmacy would be forced to sign the contract anyway.

70.     A combined ESI-Medco would also significantly impact the quantity, quality, and range of pharmacy services Value Specialty Pharmacy is able to provide to patients, thereby undermining hard-won goodwill among its customers and communities.

71.     Further reductions in reimbursement rates as a result of the merger likely would force Value Specialty Pharmacy to reduce pharmacy hours; reduce or cut patient programs, including medication and wellness counseling; and possibly even close altogether. Thus, Value Specialty Pharmacy, its parent Value Drug Company, and its customers will be immediately and irreparably harmed by the acquisition.

72.     Value Drug Company is also a purchasing cooperative of more than 550 independent drugstores that provides wholesale pharmaceutical distribution services to its members, primarily in the central Pennsylvania area. These drugs are resold to Value Drug Company's members. Value Drug Company would be injured in its capacity as a seller of pharmaceutical distribution services to its members, who will be injured by the merger's effect

on the sale of retail pharmacy services. Thus, Value Drug Company will be immediately and irreparably harmed by the acquisition in its capacity as a wholesaler.

73.    Defendant Express Scripts, Inc. is a corporation organized and existing under the laws of Delaware, having its principal place of business at One Express Way, St. Louis, MO 63121. In 2011, ESI reported revenues of over $46 billion. In 2010, ESI covered approximately 90 million lives and controlled 753.9 million prescriptions, most of which were filled by Plaintiffs' pharmacies. ESI also owns and operates CuraScript, the third largest specialty pharmacy in the U.S., as well as the largest mail-order pharmacy business.

74.    Defendant Medco Health Solutions, Inc. is a corporation organized and existing under the laws of Delaware, having its principal place of business at 100 Parsons Pond Dr., Franklin Lakes, NJ 07417. In 2010, Medco covered approximately 65 million lives. In 2011, Medco controlled 757.4 million prescriptions and reported revenue of over $70 billion, most of which were filled by Plaintiffs' pharmacies. Like ESI, Medco also owns and operates a proprietary mail-order pharmacy business, as well as Accredo, the second-largest specialty pharmacy.

## IV.  THE ACQUISITION

75.    On July 20, 2011, ESI and Medco entered into an Agreement and Plan of Merger, pursuant to which ESI would ultimately acquire Medco for 0.81 shares of ESI and $28.80 in cash per Medco share, for a total of approximately $29 billion.

76.    If approved, this acquisition would result in the largest PBM in the United States, controlling and limiting access to prescription medications for 155 million people, more than 1/3 of all Americans.

## V. JURISDICTION AND VENUE

77.     This action is filed by Plaintiffs under Section 16 of the Clayton Antitrust Act, 15

U.S.C. § 26, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15

U.S.C. § 18.

78.     This Court has subject matter jurisdiction of the federal antitrust claims asserted in

this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337.

79.     Defendants purchase retail pharmacy services, sell prescription drugs via mail-

order, manage the use of prescription drugs bought by beneficiaries of large drug benefit plans,

provide PBM services bought by large drug benefit plans, and sell specialty prescription drugs in

the flow of interstate commerce in the United States. Their activities substantially affect

interstate commerce. This Court has subject matter jurisdiction over the federal antitrust claims

asserted in this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331

and 1337.

80.     Defendant ESI ships goods, promotes, purchases and sells goods and services, and

otherwise transacts business of a substantial character in Pennsylvania. Defendant Medco ships

goods, promotes, purchases and sells goods and services, and otherwise transacts business of a

substantial character in Pennsylvania. Venue and personal jurisdiction over Defendants are proper

under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391.

## VI. THE RELEVANT MARKETS

81.     There are multiple relevant markets in which competition would be substantially

lessened by the proposed merger of ESI and Medco: (a) the purchase of retail community

pharmacy services in fifty-one geographic markets, including fifty geographic markets each

consisting of a single state in the United States, and a geographic market consisting of the

District of Columbia; (b) the provision of Clinical Specialty Drugs in the United States; (c) the provision of full service, nationwide PBM services to large private employers in the United States; and (d) the provision of drugs to beneficiaries of large plan sponsors in various local markets.

### A. The Purchase of Retail Community Pharmacy Services in State Markets

82. Many health care plan sponsors rely on PBMs to administer prescription drug benefit plans and manage drug utilization. PBMs contract with retail community pharmacies to purchase retail community pharmacy services, including the dispensing of prescription drugs, as part of the PBM's administration of prescription drug benefits. Retail community pharmacies provide critical services to patients under PBM plans, including dispensing prescription drugs, educating patients about drug side effects, and counseling patients about drug interactions. Retail community pharmacies also provide a range of other health and wellness services to PBM plan beneficiaries, including health screenings, immunizations, nutrition counseling, and medication adherence counseling.

83. From a retail community pharmacy's perspective as a seller, there are no substitutes for the purchase of retail pharmacy services. A retail community pharmacy either contracts with a purchaser of retail pharmacy services for the sale of its retail pharmacy services or the pharmacy's labor and capital investments in those services will be wasted. Similarly, from the retail community pharmacy's perspective as a seller, the purchase of other goods and services (by potential customers of a retail community pharmacy) is not reasonably interchangeable with the purchase of retail pharmacy services, as pharmacy services and its inputs are specialized and not saleable to buyers not seeking these specific services.

84.     A small but significant decrease by a hypothetical monopsonist in the price paid to pharmacies for retail pharmacy services would not cause pharmacies to seek other purchasers of their services or to otherwise change their activities sufficiently to make such a price reduction unprofitable to the hypothetical monopsonist. Therefore, cross-elasticity of supply between the purchase of retail pharmacy services and any potential alternatives is low or zero. This is demonstrated by the fact that PBMs have successfully implemented reimbursement reductions in the past without driving sellers of retail pharmacy services to alternative purchasers.

85.     Numerous states require PBMs to obtain licenses or certificates of registration, or otherwise to submit to state-specific regulator requirements to operate within a state, including Connecticut (CONN. GEN. STAT. § 38a-479aaa (2011)), Georgia (GA.CODE ANN. § 26-4-110.1 (2011); GA. CODE ANN. §§ 33-64-1 - 33-64-7 (2011)), Iowa (IOWA CODE §§ 510B.1 – 510B.1 (2011)), Kansas (KAN. STAT. ANN. § 40-3821 (2011)), Maryland (MD. INSURANCE CODE ANN. § 15-10B-20 (2012)), Mississippi (MISS. CODE ANN. §§ 73- 21-151 – 73-21-159), North Dakota (N.D. CENT. CODE § 26.1-27.1-1 – 26.1-27.1-11 (2011)), Rhode Island (R.I. GEN. LAWS § 27-29.1 (2011)), South Dakota (S.D. CODIFIED LAWS § 58-29E-1 – 58-29E-11(2011)); and Vermont (VT. STAT. ANN tit. 18 § 942).

86.     Retail community pharmacies in a given state cannot sell pharmacy services to PBMs that are not permitted by statute or regulation to operate within that state. Retail community pharmacies in a given state also cannot sell pharmacy services to PBMs that do not have customers who fill prescriptions within that state. Therefore, for a retail community pharmacy operating in a given state, that state is the area in which a seller of retail community pharmacy services may rationally look for a buyer of those services.

87.     If a hypothetical monopsonist of PBM purchasing pharmacy services in a given state were to reduce reimbursement rates by a small, but significant amount for a non-transitory period of time, retail community pharmacies could not reasonably sell pharmacy services to PBMs operating exclusively in other states. Thus, such a reimbursement decrease would be profitable to the hypothetical monopsonist.

88.     On information and belief, many PBMs lack a national or multiregional presence.

89.     Accordingly, a relevant product market within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18, is the purchase of retail community pharmacy services, and relevant geographic markets within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18, are each of the fifty states in the United States and the District of Columbia.

90.     In the alternative, a relevant geographic market within the meaning of Section 7 of the Clayton Act, U.S. C. § 18 is the United States, because pharmacies in the United States cannot sell retail community pharmacy services to PBMs operating exclusively in other countries. Therefore, to the extent that that the area in which a seller of retail community pharmacy services may rationally look for a buyer of those services is broader than a state, that area is limited to the United States.

**B.     The Provision of Clinical Specialty Drugs in the United States**

91.     There are two distinct categories of drugs that are commonly called "specialty drugs." First, Defendants maintain formularies of drugs (i.e., lists of drugs for which a PBM provides reimbursement under its administered pharmacy benefit plan) with certain drugs designated by Defendants as "specialty drugs." Defendants unilaterally can and do change their formularies to designate new and existing drugs as "specialty drugs" (hereinafter "Designated Specialty Drugs"). The second category of drugs that are commonly called "specialty drugs" are

drugs that should be dispensed and managed through a specialty pharmacy because they require specialized storage, control and security, handling, administration, and patient monitoring to achieve successful clinical outcomes (hereinafter "Clinical Specialty Drugs"). Most traditional retail community pharmacies cannot dispense Clinical Specialty Drugs without operating as or contracting with 'specialty pharmacies," which are pharmacies that specialize in the provision of specialty drugs.

92. Once a drug is designated as a "specialty drug" by a given PBM (e.g., becomes a "Designated Specialty Drug"), the PBM typically prohibits retail community pharmacies, including pharmacies that are licensed to offer specialty drugs and pharmacies with separate specialty drug operations, from seeking reimbursement for sale of this drug to persons under a plan administered by the PBM. Normally, only the PBM's proprietary "specialty pharmacies" or other specialty pharmacies in the PBM's network may dispense and obtain reimbursement for such sales. Thus, the PBM's designation of a drug as "specialty" effectively excludes retail community pharmacies from competing for the provision of Designated Specialty drugs.

93. The classification of Designated Specialty Drugs is often performed by PBMs to advance the financial interests of the PBMs' specialty pharmacy subsidiaries, and is not based on a widely-accepted clinical definition of "specialty drugs" or on the clinical needs of patients. In fact, re-classifying a drug as "specialty" makes it much more likely that the patient will be forced to receive the drug through the mail without the face-to-face clinical services provided by retail community pharmacies.

94. Absent the restrictive reimbursement policies implemented by PBMs, retail community pharmacies are fully capable of competing for the provision of many Designated Specialty Drugs. In fact, many Designated Specialty Drugs can be, and have been, appropriately

dispensed by retail community pharmacies. Moreover, many Designated Specialty drugs should be dispensed with continual interaction among the pharmacist, the physician, and the patient. When retail community pharmacy services are properly utilized, the pharmacist, as part of the healthcare delivery team, makes sure that the drugs are being properly administered and carefully monitors the effectiveness of the treatment and any interactions with other medications. Quickly switching a patient off an ineffective treatment can save the plan and the patient significant resources, reduce harmful drug interactions and result in better outcomes.

95. PBMs provide Clinical Specialty Drugs, as well as Designated Specialty Drugs, through their proprietary "specialty pharmacies," which are facilities that specialize in the provision of specialty drugs. PBM-owned subsidiaries often provide Clinical Specialty Drugs and Designated Specialty drugs by mail throughout the United States.

96. Many of the Associations' members own or contract with specialized facilities to dispense Clinical Specialty Drugs. These members compete directly with Defendants' specialty pharmacies for the provision of Clinical Specialty Drugs.

97. Plaintiff Value Drug Company, through its subsidiary Value Specialty Pharmacy, competes directly with Defendants' specialty pharmacies for the provision of Clinical Specialty Drugs.

98. PBMs' clients (plan sponsors) and their patient beneficiaries cannot substitute the provision of non-Clinical Specialty Drugs for the provision of Clinical Specialty Drugs due to the complexity of storing, controlling, securing, handling, administering, and monitoring the usage of these drugs. Therefore, the provision of non-Clinical Specialty Drugs is not reasonably interchangeable with the provision of Clinical Specialty Drugs.

99. If a hypothetical monopolist of the provision of Clinical Specialty Drugs were to increase prices on the provision of those drugs by a small, but significant amount for a non-transitory period of time, PBMs' clients (plan sponsors) and their patient beneficiaries would not turn to alternative drug provision services such that this price increase would be unprofitable to the hypothetical monopolist. Therefore, cross-elasticity of demand between the provision of Clinical Specialty Drugs and any potential alternatives is low or zero.

100. There are substantial barriers to entry and expansion in the market for Clinical Specialty Drugs. The ability of a PBM proprietary specialty pharmacy to secure exclusive distribution agreements with manufacturers of Clinical Specialty Drugs constitutes a significant competitive advantage over other specialty pharmacies. Indeed, drug manufacturers typically award exclusive agreements to firms with access to more lives. Large PBMs with proprietary specialty pharmacies are in a position to leverage their dominance in the PBM market to drive patients to their specialty pharmacies by using their negotiating power with pharmaceutical drug manufacturers to secure exclusive deals on Clinical Specialty Drugs. Furthermore, the large PBMs are able to use the claims adjudication process (e.g., prior authorization) to effectively block competitors from filling prescriptions. Thus, retail community pharmacies and specialty pharmacies that are not a subsidiary of a major PBM will have difficulty entering the specialty pharmacy market or expanding their current operations because they lack this built-in preferred access to a large pool of lives and the ability to determine where patients with PBM-administered plans can fill their prescriptions.

101. United States laws, including 28 U.S.C. § 301 et seq and 28 U.S.C. § 952, prohibit the importation of many Clinical Specialty Drugs or other drugs into the United States by customers.

102.     The United States is the area in which a buyer of Clinical Specialty drug services may rationally look for of those services.

103.     Accordingly, a relevant product market within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18 is the provision of Clinical Specialty Drugs, and a relevant geographic market within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18, is the United States.

### C.     The Provision of Full-Service, Nationwide PBM Services in the United States to Large Private Employers

104.     Large private employers with national operations require full-service, nationwide PBM services that can only be provided by large, national PBMs with a nationwide network of retail pharmacies, nationwide mail-order pharmacy services, nationwide specialty pharmacy services, and the infrastructure necessary to administer large plans.

105.     Large private employers with national operations do not view regional or limited scale PBMs as reasonably interchangeable with or a substitute for the full-service, nationwide PBM services offered by the Big Three.

106.     If a hypothetical monopolist of full-service, nationwide PBM services to large employers were to increase prices of such services by a small, but significant amount for a non-transitory period of time, large private employers would not turn to alternative services such that this price increase would be unprofitable to the hypothetical monopolist.  Therefore, for large private employers, cross-elasticity of demand between the provision of full-service, nationwide PBM services and any potential alternatives is low or zero.

107.     The Big Three are the only three PBMs with the breadth of service, scale and infrastructure necessary to consistently compete for the business of large private employers with workforces distributed across the country, as evidenced by the fact that over 40 of the "Fortune

50" currently rely on one of the Big Three.[15]  Moreover, excluding companies with their own

PBM or pharmacy, only **one** of the top 50 large private employers (by number of employees) in

the United States contracts with a PBM other than the Big Three.[16]

108.    The Big Three also dominate PBM contracting for the top 100, 200, and 300

employers in the United States.  Indeed, 89 percent of the top 100 private employers (by number

of employees) contract with one of the Big Three; 88 percent of the top 200 private employers

(by number of employees) contract with one of the Big Three; and 87 percent of the top 200

private employers (by number of employees) contract with one of the Big Three.[17]

109.    The Associations' members include large firms that are purchasers of full-service,

nationwide PBM services in the United States.

110.    Smaller PBMs do not have full-service, large-scale, or nationwide operations,

because their focus (and capabilities) is on regional employers as opposed to national employers.

This fact is evidenced by available switching data showing that large employers almost

exclusively switch among the Big Three.

111.    As Medco's CEO has publicly admitted, smaller competitors do not effectively

compete with the Big Three:

> Q…just to follow up on the pricing question.  I think, obviously, **everyone's always focused on your two primary competitors**.  Are you seeing any behavioral changes from the smaller PBMs out there potentially getting more aggressive or has that behavior been kind of consistent as well?
> A. (Snow)…For the most part, I would tell you that when – the best and finals I go

---

[15] Morgan Stanley Research, *Healthcare Services & Distribution: Fortune 50 and Respective PBMs*, July 28, 2011.

[16] That employer, Best Buy Co., contracts with UnitedHealth Pharmacy Solutions (UHPS), which is a captive PBM to UnitedHealth.  Due to its captive nature, other health insurance providers are typically not amenable to engaging UHPS of UnitedHealth—their direct competitor for the provision of broader health insurance—as a "carve-out" for PBM services.

[17] HealthLeaders data.

to, **I'm not seeing a lot of secondary PBMs in the mix at all. I'm really not.** You may see a name pop up here and there, but that's not really common at all.[18]

112.    PBMs and large private firms negotiate contractual terms of service and prices individually.  PBMs also have information about large private employers—namely their size and benefits needs—that would allow them to identify customers that are likely to pay a higher price for relevant PBM services.  Additionally, arbitrage is not possible in this market.  In other words, a small employer cannot sell PBM services that it acquires at one price to a large employer for a profit.  Therefore, price discrimination based on an employer's size or other characteristics is feasible.

113.    The Federal Trade Commission (FTC) identified "the provision of [PBM] services by national full-service PBM firms" as a relevant market in its review of the merger between Caremark Rx, Inc. and AdvancePCS.[19]  The FTC also found that, after that transaction, there were only three "remaining independent, full-service PBMs with national scope – Medco, ESI, and the merged Caremark/AdvancePCS."[20]  Prior to that transaction, the FTC identified the same market in its complaints in *Merck & Co., Inc.*, 127 F.T.C. 156 (1999); and *Eli Lilly and Company, Inc.*, 120 F.T.C. 243(1995), *order set aside*, 127 F.T.C. 577 (1999).

114.    As the FTC noted when challenging the Merck/Medco transaction in 1998,"[t]here are substantial entry barriers into the relevant markets [for PBM services by national full-service PBM firms]."  The Big Three enjoy significant brand-awareness and brand-trust advantages over new players.  Smaller PBMs looking to expand into this top tier would also have to integrate vertically into the mail-order and specialty pharmacy markets to match the

---

[18] Bloomberg Transcript, Medco Q2 2010 Earnings Call, at 12 (July 22, 2010) (emphasis added).

[19] Statement of FTC in re Caremark Rx, Inc./AdvancePCS, File No. 0310239 (February 11, 2004), available at http://www.ftc.gov/os/caselist/0310239/040211ftcstatement0310239.pdf.

[20] *Id.*

breadth of services offered by the Big Three. Furthermore, second tier, niche, and captive PBMs would have to expand the geographic scope of their coverage to match the nationwide coverage offered by the Big Three. Lastly, a PBM seeking to expand into the top tier is confronted with the problem of the significant switching costs faced by plan sponsors when switching PBMs, particularly by large, nationwide plan sponsors. Some categories of PBMs face more specific barriers. For instance, PBMs captive to, or otherwise operated by health plans, will likely have difficulties convincing other health plans to contract with the subsidiary of a competitor health plan. This would mean that such a PBM would need to be extraordinarily successful in winning other customer segments, such as the corporate segment, in order to remain viable and grow. Even if entry and expansion were possible, it would not be timely. The closest second tier competitors would have to significantly expand their claims processing capacity to absorb even a small proportion of the business of the Big Three.

115. Members of the Associations have tried and failed to enter this market in the recent past.

116. Full-service, nationwide PBMs must be national in scale to compete effectively for large private employers. These PBMs compete for business across the United States. For a large private employer that is seeking full-service nationwide PBM services, the United States is the area in which the buyer may rationally look for of those services.

117. Accordingly, a relevant product market within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18 is full-service, nationwide PBM services, and a relevant geographic market within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18, is the United States.

**D.** **The Provision of Prescription Drugs to Beneficiaries of Large Plan Sponsors in Local Markets**

118. Beneficiaries of PBM-administered drug benefit programs typically have the option of purchasing prescription drugs from one of several locations, including local retail community pharmacies or PBM-run mail-order facilities. PBMs and retail pharmacies directly compete for this business.

119. The purchase of prescription drugs is not reasonably interchangeable with the purchase of other products, because prescription drugs serve specific and often unique therapeutic purposes, and because acquiring these drugs through other means would be prohibitively expensive and, in some instances, unlawful. A hypothetical monopolist of the provision of prescription drugs could increase the price of providing prescription drugs by a small but non-transitory amount without causing patients to substitute alternatives for the provision of prescription drugs such that this price increase would be unprofitable. Thus, cross elasticity of demand between the provision of prescription drugs and other alternative services is low or zero.

120. In many cases, beneficiaries purchasing prescription drugs from either retail community pharmacies or PBM-run mail-order facilities or PBM-owned specialty pharmacies have very few local options. Retail community pharmacies geographically distant from these beneficiaries are not reasonably interchangeable with local community pharmacies. The practical limits of geographic substitution in the provision of drugs are reflected in federal regulations designed to ensure adequate access for Medicare Part D beneficiaries by limiting the maximum distance between retail community pharmacies offering Medicare Part D coverage under a given plan to 2 miles in urban areas (for 90 percent of persons covered by Medicare Part D), 5 miles in suburban areas (for 90 percent of persons covered by Medicare Part D), and 15

miles in rural areas (for 70 percent of persons covered by Medicare Part D). 42 C.F.R. § 423.120. These geographic areas are the areas in which the buyer of prescription drugs may rationally look for of these services.

121.     Thus, a large plan sponsor looks at the choice of one PBM network with several local pharmacies available to the plan's beneficiaries versus another PBM network with a similar number of local pharmacy choices. Therefore, choices available to local beneficiaries likely include only a small number of suppliers: national PBM-owned mail-order facilities and a limited number of local pharmacies.

122.     Accordingly, a relevant product market within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18 is the provision of drugs to beneficiaries of large plan sponsors, and relevant geographic markets within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18, areas extending 2 miles from urban beneficiaries of large plan sponsors, 5 miles from suburban beneficiaries of large plan sponsors, and 15 miles from rural beneficiaries of large plan sponsors, as provided and with the same meaning as 42 C.F.R. § 423.120.

## VII.  MARKET CONCENTRATION

123.     The relevant markets are highly concentrated and would become significantly more concentrated as a result of the proposed acquisition.

124.     The *Horizontal Merger Guidelines* issued by the Department of Justice and FTC rely on the Herfindahl-Hirschman Index ("HHI") as a measure of market concentration. Market concentration provides a structural indicator of the strength of competition in a given market and the likelihood of coordination between competitors. Markets in which the HHI is between 1,500 and 2,500 points are considered moderately concentrated, and markets in which the HHI is in excess of 2,500 points are considered highly concentrated. Transactions that increase the HHI by

more than 200 points in a highly concentrated market are presumed likely to enhance market power.

125.    In state markets for the purchase of retail pharmacy services, data show that ESI and Medco often collectively control over a 50 percent share of individual pharmacy prescriptions. In these markets, HHI after the acquisition will be over 3,000 points, with a change of over 1000 points resulting from the acquisition.

126.    In the market for the provision of Clinical Specialty pharmacy services, analysis done by Pembroke Consultants based on publicly available data show that Medco (Accredo Health) and ESI (CuraScript) collectively dispense approximately 31 percent of "specialty" pharmacy prescriptions, and CVS Caremark dispenses approximately 25 percent. On information and belief, this analysis relies on a flawed definition of specialty pharmacy drugs that deflates Defendants' market share and ignores clinical considerations in favor of PBMs self-designations. Nonetheless, even using this flawed definition of "specialty" drugs, HHI after the acquisition will be over 2,600, with a change of approximately 400 to 1,000 points resulting from the acquisition.

127.    In the market for the provision of full-service, nationwide PBM services to large private employers in the United States, ESI and Medco collectively have approximately a 50 to 60 percent share of PBM services, and the Big Three combined have nearly a 90 percent share of PBM services. In this market, HHI after the acquisition will be over 3,000 points, with a change of over 1000 points resulting from the acquisition.

128.    In some markets for the provision of drugs to beneficiaries of large plan sponsors, ESI and Medco collectively have over 50 percent of the market with very few other competitors.

In these markets, HHI after the acquisition will be over 3,000 points, with a change of over 1000 points resulting from the acquisition.

## VIII. COMPETITIVE EFFECTS

**A.**     **The Proposed Acquisition Would Eliminate Head-to-Head Competition Between ESI and Medco and Promote Anticompetitive Coordination Between Competitors in the Purchase of Retail Community Pharmacy Services.**

129.     The proposed acquisition would combine two of the three largest purchasers of retail pharmacy services in the United States and in local markets.

130.     After the acquisition, many retail community pharmacies, including Plaintiffs' Pharmacies, will be forced to deal with a combined ESI-Medco regardless of its purchase terms because refusing to accept ESI-Medco's terms would foreclose a high percentage of retail prescriptions and access to ESI-Medco's current retail customers such that many of the pharmacies would become unviable.

131.     ESI-Medco's enhanced market power in the market for the purchase of retail community pharmacy services will harm Plaintiffs and competition in at least two ways. First, the acquisition will allow the merged firm to profitably and unilaterally reduce reimbursement for the purchase of retail community pharmacy services below competitive levels and will promote potential coordination among the remaining two of the Big Three on reimbursement rates. Second, the acquisition will permit ESI-Medco to unilaterally force retail community pharmacies to accept contractual terms and business behavior detrimental to the pharmacies and competition, including restrictions on pharmacies' abilities to offer mail-order and specialty services, and the acquisition will also promote potential coordination among the remaining two of the Big Three on contractual terms and business behavior.

36

132. The resulting effects will irreparably harm the goodwill and customer relations of retail community pharmacies and in many cases cause them to reduce services or exit the market. The harm to employers, plans and patients as a result of less competition will be increased costs, few choices, less services, and less value.

133. The structure of the market for the purchase of retail pharmacy services is conducive to coordination.[21] Many reimbursement terms and other competitive purchasing terms are publicly available. Additionally, both Defendants already transact business with the remaining Big Three PBM in its capacity as a pharmacy. Therefore, pricing and other purchasing terms in this market are very transparent among the Big Three. Furthermore, Defendants purchase retail pharmacy services from tens of thousands of retail community pharmacies in small quantities. Markets characterized by large numbers of small transactions are vulnerable to coordination because incentives to "cheat" on a tacitly agreed-upon pricing by reducing prices on any given transaction will not result in a sizable enough benefit to the cheater.

134. Reduced reimbursement rates to retail community pharmacies will ultimately reduce the quality of retail community pharmacy services by forcing retail community pharmacies to reduce hours and limit other services for patients. Furthermore, reduced reimbursement rates likely will not be passed to plan sponsors or patients. PBMs typically charge more to plan sponsors than they reimburse to pharmacy service providers, retaining the difference as profit.

135. Forcing retail community pharmacies to accept restrictions on mail-order and specialty pharmacy business will harm competition between pharmacies and Defendants, and

---

[21] Coordination in this context includes implicit coordination. Implicit coordination does not violate the Sherman Act or other antitrust laws. Nonetheless, increasing market concentration through a merger such that implicit coordination is more likely "substantially lessen[s]" competition under Section 7 of the Clayton Act.

further reduce the viability of retail pharmacies by diverting profitable business away from Plaintiffs. Reducing the quality of pharmacy services offered by retail community pharmacies and reducing their ability to compete for mail-order and specialty business will cause irreparable harm to the goodwill of the Plaintiffs Pharmacies and threaten their patients' health.

136.    Compared to the typical monopsony or duopsony case, Defendants will have an unusually strong incentive to purchase sub-optimal levels of Plaintiffs' services and to set sub-optimal prices because reduced output and reduced quality in retail community pharmacy services resulting from sub-optimal reimbursement rates would force or encourage patients to use Defendants' proprietary mail-order and specialty services, thereby increasing the value adjusted price for patients and reducing choice and value for patients.

137.    Industry analysts recognize that increasing concentration in the market for the purchase of retail pharmacy services has already increased Defendant ESI's purchasing power. For instance, in analyzing ESI's 2010 acquisition of WellPoint's NextRX PBM , JP Morgan concluded

> Given the size, we view the $4.7 billion acquisition of WellPoint's NextRx
> PBM business as a transformational deal for Express Scripts. We note that
> the addition of the NextRx scripts puts the company on relatively equal
> footing with its two large peers, and the larger size translates into greater purchasing
> leverage with manufacturers and retail pharmacies.[22]

### B.    The Proposed Acquisition Would Eliminate Head-to-Head Competition Between ESI and Medco in the Provision of Clinical Specialty Pharmacy Services.

138.    ESI's acquisition of Medco would combine the second- and third- largest specialty pharmacies in the U.S. and the largest specialty pharmacies in various local markets.

---

[22] J.P. Morgan, *Gill's Guide to the Rx Channel – An Investor Handbook*, at 216, 217 (May 10, 2011).

139.     ESI-Medco's enhanced market power in the market for the purchase of Clinical Specialty Pharmacy Services will harm Plaintiffs and competition in at least two ways. First, the proposed acquisition will allow the combined company to unilaterally raise prices on Clinical Specialty Pharmacy Services and will promote potential coordination on pricing among the few remaining competitors in this market. Second, the proposed acquisition would provide ESI-Medco even greater power to exclude competing specialty pharmacies by securing exclusive contracts with manufacturers of Clinical Specialty Drugs. As noted, large PBMs with proprietary specialty pharmacies are in a position to exploit their negotiating power with drug manufacturers to secure exclusive deals on drugs. Drug manufacturers tend to favor specialty pharmacies with access to the most lives. In turn, plan sponsors and patients favor specialty pharmacies that have access to more drugs. Furthermore, Defendants are able to exploit the claims adjudication process (e.g., prior authorization) to effectively block competitors from filling prescriptions. Thus, specialty pharmacies that are not subsidiaries of Defendants will have difficulty competing in the specialty pharmacy market because they lack this built-in preferred access to a large pool of lives and the ability to determine where patients with PBM-administered plans can fill their prescriptions. The proposed acquisition will exacerbate this problem by giving the combined entity additional leverage in negotiations with Clinical Specialty drug manufacturers and by enhancing Defendants' ability to divert business away from Plaintiffs through claims adjudication.

140.     The Plaintiffs that operate specialty pharmacies will also be injured in their capacities as competitors in this market due to their likely exclusion resulting from exclusive dealing contracts between Defendants and drug manufacturers and from Defendants' ability to divert business away from Plaintiffs through claims adjudication. Additionally, the Plaintiffs

that operate specialty pharmacies will be injured when ESI-Medco uses its market power to force plan sponsors to accept exclusive specialty networks consisting only of CuraSript and Accredo.

141.  The exclusion of Plaintiffs from the specialty pharmacy market through drug dispensing limitations (due to Defendants' exclusive contracts and claims adjudication) as well as Plaintiffs' resulting inability to serve their patients, will cause irreparable harm to the goodwill of Plaintiffs' members and the pharmacy services provided to their patients.

142.  In many cases, Plaintiffs will be forced to reduce their services and to close their businesses due to financial losses resulting from reduced contracting opportunities and increased prices on Clinical Specialty Drug services.

143.  Plaintiffs' injuries resulting from their likely loss of contracting opportunities and increased Clinical Specialty pharmacy prices are independent antitrust injuries and inextricably intertwined with the antitrust injury to patients and sponsors caused by eliminating head-to-head competition between ESI and Medco and reducing the breadth of their services.

144.  The resulting effects will irreparably harm the good will and customer relations of Plaintiffs and in many cases cause them to reduce services or exit the market. The harm to plan sponsors and their members as a result of less competition will be increased costs, fewer choices, less services, and less value.

**C.  The Proposed Acquisition Would Eliminate Head-to-Head Competition Between ESI and Medco and Promote Anticompetitive Coordination Between Competitors in the Provision of Full-Service, Nationwide PBM Services to Large Private Employers in the United States**

145.  The proposed acquisition would combine two of the largest providers of full-service, nationwide PBM services in the United States.

146. Defendants currently compete in the full-service, nationwide PBM services market based on price and quality of services, including the quality and breadth of their drug formularies.

147. The proposed acquisition will allow the combined company to unilaterally raise prices on Clinical Specialty Pharmacy Services to plan sponsors and will promote potential coordination among the combined ESI-Medco and their only other remaining Big Three competitor. In addition to the price effects of this acquisition, ESI-Medco will be able to manipulate their drug formularies in at least two ways that are anticompetitive and injurious to Plaintiffs. First, ESI-Medco will be able to increase their selective designations of high margin drugs as "specialty drugs" to divert sales of these drugs from Plaintiffs. As noted, these "specialty" designations often have little or no clinical justification. Indeed, Defendants' unilateral designation of such drugs as "specialty" drugs often serves no cognizable purpose other than to reduce competition with retail community pharmacies and to increase Defendants' profits at the expense of retail community pharmacies as well as plan sponsors and patients, who will be forced to pay higher prices and suffer reduced pharmacy services associated with ESI-Medco's captive specialty pharmacies. Second, ESI-Medco will be able to design its formulary to divert patients to high-priced branded drugs instead of generic drugs. PBMs already have an incentive to engage in this behavior due to manufacturer "rebates" that reward PBMs for forcing patients to use expensive brand medications. As a result of the acquisition, ESI-Medco will be able to increase its use of this tactic.

148. At present, competition among the Big Three for the provision of full-service, nationwide PBM services to large plan sponsors currently restrains their ability to manipulate their formularies to the detriment of plan sponsors, patients, and pharmacies. For instance, all

other things equal, if Medco offered a coverage plan to a large plan sponsor that included a significant number of unnecessary specialty designations and branded drugs, and ESI offers a coverage plan that included fewer unnecessary specialty designations and generic drugs, a large plan sponsor likely would choose ESI. Similarly, if Medco acquired a reputation for unnecessarily shifting drugs from generic or non-specialty to branded or specialty for its existing customers, the large plan sponsor might choose to contract with ESI in the future. By removing competition between ESI and Medco, the proposed acquisition will allow the combined company to unilaterally reduce the breadth and quality of its formulary without fear of competition from the other company. Similarly, the acquisition will greatly decrease competition in the market, increasing the potential that the merged firm will coordinate with their sole remaining significant competitor in this market.

149. The structure of the market for the provision of full-service, nationwide PBM services to large plan sponsors is conducive to coordination for the same reasons that the markets for the purchase of retail community pharmacy services are conducive to coordination.

150. Members of the Associations will be harmed in their capacity as buyers of full-service, nationwide PBM services by price increases on these services and by Defendants' manipulation of their formulary to include more expensive branded drugs and Designated Specialty drugs. Plaintiffs will be harmed in their capacity as competitors to Defendants by Defendants' self-serving and inappropriate diversion of Designated Specialty drugs away from retail community pharmacies to Defendants' captive specialty pharmacies and their forcing or more customers into mail-order pharmacies to eliminate competition for the provision of drugs.

151. The resulting effects will irreparably harm the good will and customer relations of Plaintiff and in many cases cause them to reduce services or exit the business. The harm to

employers, plan sponsors and patients as a result of less competition will be increased costs, fewer choices, less services, and less value.

152.    The diversion of patients from retail pharmacies to Defendants' specialty pharmacies, Plaintiff s' financial losses due to increased prices on PBM services for their employees, and Plaintiffs' resulting inability to serve their patients in the manner the patients prefer to be served, will cause irreparable harm to the goodwill of Plaintiffs and would harm patients.

153.    Plaintiffs' injuries resulting from a diminished ability to compete for certain drugs designated as "specialty drugs" and their injuries resulting from increased prices on PBM services for Plaintiffs' employees, are independent antitrust injuries that are inextricably intertwined with the antitrust injury to large employers caused by the elimination of head-to-head competition between ESI and Medco and the reduction in the breadth and quality of their drug formularies.

### D.    The Proposed Acquisition Would Eliminate Head-to-Head Competition Between ESI and Medco in the Provision of Prescription Drugs to Beneficiaries of Large Plan Sponsors

154.    In many local markets, ESI and Medco are two of the largest competitors in the provision of drugs to beneficiaries of large plan sponsors.  ESI and Medco compete with retail community pharmacies in these markets by offering national mail-order services and specialty pharmacy services that overlap with the local areas served by pharmacies.

155.    PBMs limit customers' choices as to where and how to fill a prescription through restrictions in contracts between the PBMs and plan sponsors.

156. ESI and Medco currently compete for plan sponsors and patients on the quality and breadth of their services, including contractual terms providing where and how a patient may fill prescriptions.

157. The merger between ESI and Medco will remove that competitive pressure and give the combined company additional leverage to unilaterally impose additional contractual restrictions on plan sponsors and ultimately patients as to where and how patients fill prescriptions. The merger will also promote potential coordination among the combined ESI-Medco and their only other remaining Big Three competitor regarding contractual restrictions and other terms of competition in this market.

158. ESI-Medco will have an incentive to divert customers from retail community pharmacies to ESI-Medco's mail-order pharmacy or ESI-Medco's specialty pharmacy regardless of customers' preferences, thereby reducing competition in the provision of drugs to beneficiaries of large plan sponsors, injuring retail pharmacies, and reducing patient choice.

159. Plaintiffs' injuries resulting from Defendants' ability to impose additional contractual restrictions on plan sponsors and ultimately their beneficiaries are independent antitrust injuries that are inextricably intertwined with the antitrust injury to patients and sponsors caused by likely reductions in patient choice.

160. The resulting effects will irreparably harm the goodwill and customer relations of pharmacies and in many cases cause them to reduce services or exit the business. The harm to plans and their beneficiaries as a result of less competition will be increased costs, fewer choices, less services, and less value.

## IX. VIOLATION ALLEGED

## VIOLATION OF SECTION 7 OF THE CLAYTON ACT, 15 U.S.C. § 18

161.    Plaintiffs re-allege and incorporate paragraphs 1 through 160 as if set forth fully herein.

162.    The consummation of ESI's acquisition of Medco would substantially lessen competition in the markets described above in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The acquisition likely would have the following effects, among others:

a.    Head-to-head competition between Defendants would be eliminated in the purchase of retail pharmacy services; the provision of Clinical Specialty pharmacy services; the provision of full-service, nationwide PBM services to large private employers; and the provision of prescription drugs to the beneficiaries of large plan sponsors.

b.    Competition generally would be reduced and the likelihood of anticompetitive coordinated interactions between the remaining competitors would be increased in the purchase of retail pharmacy services; the provision of Clinical Specialty pharmacy services; the provision of full-service, nationwide PBM services to large private employers; and the provision of prescription drugs to the beneficiaries of large plan sponsors.

c.    Prices would increase in the provision of clinical specialty pharmacy services; the provision of full-service, nationwide PBM service to large plan sponsors; and the provision of prescription drugs to the beneficiaries of large private employers.

d.    The quality and breadth of services would decline in the provision of retail community pharmacy services; the provision of Clinical Specialty pharmacy

services; the provision of full-service, nationwide PBM services to large plan sponsors; and the provision of prescription drugs to the beneficiaries of large private employers.

e.  Reimbursement rates would decline to a sub-optimal level in the purchase of retail community pharmacy services, and the quality of pharmacy services would likewise decline.

f.  Plaintiffs would be irreparably harmed by the reduction in competition in the purchase or retail community pharmacy services; the provision of Clinical Specialty pharmacy services; the provision of full-service, nationwide PBM services to large private employers; and the provision of prescription drugs to the beneficiaries of large plan sponsors.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request:

a.  that the proposed acquisition be adjudged to violate Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18;

b.  that the Defendants be preliminarily and permanently enjoined and restrained from consummating their merger;

c.  that Plaintiffs be awarded the cost of this action; and

d.  that Plaintiffs be awarded such other relief as the Court may deem just and proper.

DATED:  March 29, 2012

Respectfully submitted,


J. Robert Robertson (DC Bar #501873)
   (*pro hac vice* to be filed)
Corey W. Roush (DC Bar #466337)
   (*pro hac vice* to be filed)
Christian M. Rowan (DC Bar #978124)
   (*pro hac vice* to be filed)
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Phone:  (202) 637-5600
Fax:  (202) 637-5910
robby.robertson@hoganlovells.com
corey.roush@hoganlovells.com

/s/ Charles B. Gibbons
Charles B. Gibbons (Pa. ID. No. 08284)
David J. Porter (Pa. ID. No. 66125)
Christopher A. Amar (Pa. ID. No. 309707)
BUCHANAN INGERSOLL & ROONEY PC
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA 15219
Phone:  (412) 562-8800
Fax:  (412) 562-1041
charles.gibbons@bipc.com
david.porter@bipc.com
christopher.amar@bipc.com

*Attorneys for Plaintiffs*

and

Peter J. Kadzik (*pro hac vice* to be filed)
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC 20006
Phone:  (202) 420-2200
Fax:  (202) 420-2201
kadzikp@dicksteinshapiro.com

*Attorney for Plaintiffs NACDS and NCPA*