**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

NATIONAL ASSOCIATION of CHAIN    )
DRUG STORES, *et al*.,            )
                                 )
            Plaintiffs,          )
                                 )        Civil Action No. 12-395
                    v.           )        Judge Cathy Bissoon
                                 )
EXPRESS SCRIPTS, INC, *et al*.,  )
                                 )
            Defendants.          )

**<u>MEMORANDUM ORDER</u>**

For the reasons stated below, Defendants' motion to dismiss (Doc. 42) will be granted

with prejudice in part, granted without prejudice in part, and denied in part.  Additionally,

Defendants' motion to take judicial notice (Doc. 44) will be denied as moot.

Defendants Express Scripts, Inc. ("ESI") and Medco Health Solutions, Inc. ("Medco")

(collectively "Defendants") are both pharmaceutical benefits management ("PBM") companies.

The record reflects that, on July 21, 2011, Defendants entered into an agreement and plan of

merger.  The Federal Trade Commission engaged in an eight-month-long investigation of the

potential merger, but concluded that it would not take action.  This decision was communicated

publicly on April 2, 2012.   Defendants consummated their merger that same day.

On March 29, 2012 – just prior to the finalization of the merger – Plaintiffs brought the

instant cause of action, alleging violations of Section 7 of the Clayton Act, and seeking

injunctive relief and costs pursuant to Section 16 of the same.  <u>See</u> 15 U.S.C. §§ 18 and 26,

respectively; <u>see also</u> (Doc. 1 at 45, 47).  Plaintiffs also filed a motion for temporary restraining

order the next day.  (Doc. 20).  An amended motion for temporary restraining order and brief in

support thereof were filed on April 2, 2012.  (Docs. 22-23).  On the following day, given the

appearance of counsel on behalf of Defendants, this Court converted the amended motion for

temporary restraining order into one for preliminary injunction.  See Text Order of Apr. 3, 2012.

Finding that Plaintiffs had not met their burden to show a likelihood of immediate irreparable

injury, this Court denied that motion on April 25, 2012.  (Doc. 58).

On April 6, 2012, shortly after the initiation of this action, Defendants filed a motion to

dismiss, raising a multitude of arguments.  See, generally, (Docs. 42 and 43). Plaintiffs

responded in opposition thereto on April 9, 2012.  (Doc. 49).  This motion is ripe for disposition.


I.      Plaintiffs' Factual Allegations

Plaintiffs describe PBMs as companies that "administer prescription drug benefit

programs for individual plan sponsors, such as HMO plans, self-insured employers, indemnity

plans, labor union plans, and plans coving public employees."  (Doc. 1 ¶ 15).  As such, they are

responsible for "processing prescription drug claims, maintaining drug formularies,[1] contracting

with pharmacies for pharmacy services, and reimbursing retail community pharmacies for

dispensing prescription drugs and providing related professional services to patients."  Id.

PBMs allegedly have become the "primary buyers of pharmacy services (on behalf of plan

sponsors and patients)."  Id. ¶ 14 (parenthetical in the original).  Additionally, PBMs "sell drugs

to plan sponsors through PBM-owned mail-order and specialty pharmacies."[2]  Id. ¶ 15

Prior to their merger, Defendants comprised two of the so-called "Big Three" PBMs,

which as a group "cover[ed] approximately 72 percent of privately insured lives in the United

---

[1] Plaintiffs defines this term as "lists of drugs for which a PBM provides reimbursement under its administered pharmacy benefit plan[.]"  (Doc. 1 ¶ 91).

[2] Plaintiffs provide the somewhat circular definition of a specialty pharmacy as one "that specialize[s] in the provision of specialty drugs."  Id. ¶ 91.

States." Id. ¶ 16.  Defendants allegedly were competitors in the markets for "the purchase of

retail community pharmacy services; the provision of specialty pharmacy services; the provision

of full-service, nationwide PBM services to large private employers; and the provision of

prescription drugs to beneficiaries of large private employers." Id. ¶ 26.

Plaintiffs allege that they and at least some of their members, which include "tens of

thousands of retail community pharmacies nationwide[,]" (Doc. 1 ¶ 30), would suffer anti-

competitive injury from Defendants' merger.  Thus, Plaintiffs claim, the merger violates

15 U.S.C. § 18 in four ways.  As a result, Plaintiffs' factual allegations are most easily organized

in the context of the four antitrust violations that they allege.


A.  The Purchase of Retail Community Pharmacy Services in State Markets

Plaintiffs who are sellers of retail community pharmacy services allege that Defendants

– as two of the three largest PBMs in the United States – individually make up large proportions

of their sales. Id. ¶¶ 16.  It is alleged that the entity created post-merger would give Defendants

an even stronger position in this market and, along with it, the power to engage in allegedly

anticompetitive acts with respect to their business dealings with these retail community

pharmacies. See id. ¶¶ 36-66 (alleging, *inter alia*, that the merged Medco-ESI entity would

make up as much of 60 percent of one retail community pharmacy's sales of prescription

medicine).  Plaintiffs allege that, while Defendants, as separate entities, allowed them some

ability to negotiate favorable reimbursement rates from the large PBMs, see id. ¶¶ 41 and 48, a

merged entity would have such potency as a purchaser of retail community pharmacy services

that it could force at least some of Plaintiffs and their members to accept reimbursement rates

that were "non-competitive, or even below-cost[.]" Id. ¶ 60; see also id. ¶¶ 37, 42, 48, 52, 56,

64.  This allegedly would force at least some of Plaintiffs and their members to cut back services and operating hours, lose good will, and possibly lose their businesses altogether as well.[3]  Id. 38, 42, 45-46, 49-5054, 57-58, 61-62, 65-66.

Plaintiffs allege that their relevant product market for this claim is the sale of retail community pharmacy services, that there are no substitutes from their members' perspectives as sellers, and that the cross-elasticity of this market essentially is nonexistent.[4]  Id. ¶¶ 83, 84, 89. The relevant geographical markets for this claim are each state individually, and the District of Columbia, due to state licensing requirements for retail pharmacies.  Id. ¶¶ 85-86, 89.  In the alternative, they allege that the relevant geographical market is the United States, because "pharmacies in the United States cannot sell retail community pharmacy services to PBMs operating exclusively in other countries."  Id. ¶ 90.


B.  The Provision of Clinical Specialty Drugs in the United States

Plaintiffs begin their factual allegations regarding this claim by fashioning two categories of "specialty drugs."  The first is so-called "Designated Specialty Drugs," which, as the name implies, are drugs that are designated by Defendants as being "special" in nature.  Id. ¶ 91. Plaintiffs allege that this is done unilaterally by Defendants when they update their formularies.

---

[3] Plaintiffs allege that some of their members already have been forced to close locations due, at least in part, to low reimbursement rates paid by Defendants prior to their merger.  See (Doc. 1 ¶¶ 41, 58).

[4] As the Court of Appeals for the Third Circuit has recognized, ""[c]ross-elasticity is a measure of reasonable interchangeability."  Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 438 n.6 (3d Cir. 1997).  In other words, it is based on whether "the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in the market."  Id. at 438 (quoting Tunis Bros. Co. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991)).

Id.  Plaintiffs allege that Designated Specialty Drugs are given this status by PBMs "often . . . to advance the financial interests of the PBMs' specialty pharmacy subsidiaries,[5] and . . . not based on a widely-accepted clinical definition . . . or on the clinical needs of patients." Id. ¶ 93. Plaintiffs assert that retail community pharmacies "are fully capable of competing for the provision of many Designated Specialty Drugs[,]" but are precluded from doing so by the PBMs' reimbursement policies, which are described below. Id. ¶ 94.

The second category of specialty drugs is so-called "Clinical Specialty Drugs." Id. ¶ 91. These "are drugs that should be dispensed through a specialty pharmacy because they require specialized storage, control and security, handling, administration, and patient monitoring to achieve successful clinical outcomes[.]" Id. ¶ 91. Most retail community pharmacies cannot dispense Clinical Specialty Drugs without contracting with a specialty pharmacy. Id. However, many of Plaintiffs' member pharmacies already own or contract specialty pharmacies for this purpose. Id. ¶ 96. Additionally, at least one Plaintiff is itself a specialty pharmacy. Id. ¶¶ 67-68, 97. Plaintiffs allege that these pharmacies compete directly with Defendants for the provision of Clinical Specialty Drugs. Id. ¶¶ 96-97.

PBMs "typically" prohibit retail community pharmacies, "including pharmacies that are licensed to offer specialty drugs and pharmacies with separate specialty drug operations, from seeking reimbursement for" the sale of both categories of specialty drugs to patients who are beneficiaries of one of the PBM's plans. Id. ¶ 92. Instead, PBMs "[n]ormally" allow only their proprietary specialty pharmacies or other specialty pharmacies in their networks to seek reimbursement for dispensing these drugs. Id. "Thus, the PBM's designation of a drug as

---

[5] Plaintiffs allege that both Defendants own specialty pharmacy subsidiaries that compete with Plaintiffs and some of their members for the provision of specialty drugs. (Doc. 1 ¶¶ 11, 92, 95-97).

'specialty' effectively excludes retail community pharmacies from" selling this drug to a beneficiary of one of Defendants' plans.  Id. ¶ 92.  As such, it is "much more likely that [a] patient will be forced to receive the drug through the mail without the face-to-face clinical service provided by retail community pharmacies."  Id. ¶¶ 93, 95.

Additionally, Plaintiffs allege that Defendants are able to increase their power in this market by entering into exclusive distribution agreements with the manufacturers of Clinical Specialty Drugs.[6]  Id. ¶¶ 100.  These agreements, which allegedly are entered into by the manufacturers  because of Defendants' size, and which allegedly will become more attractive to drug manufacturers due to Defendants' increased size post-merger, allegedly create high barriers to new competitors seeking to enter this field.  Id.  This product market allegedly becomes even more inaccessible due to Defendants' ability to use its claims adjudication process to block competitors from filling prescriptions for specialty drugs.  Id.

Plaintiffs claim that the relevant product market for this claim is the provision of Clinical Specialty Drugs.  Id. ¶ 162.  They allege that there are no reasonably interchangeable substitutes for, or alternatives to, these drugs due to the complexities associated with their provision, and that, as a result, the cross-elasticity of demand in this market is "low to zero."  Id. ¶¶ 98-99.  They further allege that the relevant geographical market for this claim is the United States.  Id. ¶¶ 101-03.

---

[6] Plaintiffs further allege that PBMs negotiate "rebates" from brand drug manufacturers to promote the sale of their drugs over less-expensive generic versions.  (Doc. 1 ¶ 13).

C.  The Provision of Full-Service, Nationwide PBM Services in the United States to
Large Private Employers

Plaintiffs allege that large private employers with national operations[7] require PBM

services that can be provided only by "large, national PBMs with a nationwide network of retail

pharmacies, nationwide mail-order pharmacy services, nationwide specialty pharmacy services,

and the infrastructure necessary to administer large plans." Id. ¶ 104.  According to Plaintiffs,

only the Big Three, two thirds of the membership of which is comprised by Defendants, have

sufficient scale, breadth of service, and infrastructure to compete effectively for the business of

such employers.  (Doc. 1 ¶¶ 17, 107).  Smaller PBMs that lack the capacity and infrastructure of

the Big Three instead focus on regional, instead of national, employers.  Id. ¶ 109.  As such,

Plaintiffs allege that large private employers with national operations "do not view regional or

limited scale PBMs as reasonably interchangeable with or a substitute for the full-service,

nationwide PBM services offered by the Big Three." Id. ¶ 105.  Indeed, the so-called Big Three

allegedly provide PBM services to approximately 90 percent of the privately insured lives for

which large employers are responsible.  Id. ¶¶ 16, 107-08.

It is Plaintiffs' position that cross-elasticity for this product market is "low or zero." Id.

¶ 106.  They also assert that price discrimination for PBM services based on employer size is

feasible, because PBMs have information regarding the size and benefit needs of large private

employers, and that small employers cannot sell PBM services that they have acquired to large

employers at a profit.  Id. ¶ 112.  Furthermore, Plaintiffs allege that high barriers to entry exist in

this market based on the Big Three's brand awareness, as well as the need for smaller PBMs to

---

[7] Plaintiffs allege that some of their members fall into this category.  (Doc. 1 ¶ 109).

vertically integrate into mail order and specialty pharmacy markets in order to compete with the infrastructure already in the Big Three's possession.  Id. ¶ 114.

Finally, Plaintiffs allege that the relevant geographic market for this type of service is the entirety of the United States.  Id. ¶¶ 116-17.


D.   The Provision of Prescription Drugs to Beneficiaries of Large Plan Sponsors in Local Markets

Plaintiffs allege that beneficiaries of PBM-administered drug benefit programs "typically have the option of purchasing prescription drugs from one of several locations, including local retail community pharmacies or PBM-run mail-order facilities."  Id. ¶ 118.  PBMs and retail community pharmacies allegedly compete directly with each other in this product market.  Id.

Plaintiffs assert that, given the therapeutic purposes of prescription drugs, and the expense and legal barriers to meeting these purposes by other means, the purchase of prescription drugs is not reasonably interchangeable with the purchase of other products. Id. ¶ 119.  Accordingly, the "cross elasticity of demand between the provision of prescription drugs and other alternative services is low to zero."  Id.

The alleged relevant geographical market for this claim is "areas extending [two] miles from urban beneficiaries of large plan sponsors, [five] miles from suburban beneficiaries . . .  and 15 miles from rural beneficiaries . . . ."  Id. ¶ 122.  This is based on the regulations governing the maximum distances allowed between pharmacies in a network of retail community pharmacies offering Medicare Part D coverage.  Id. ¶¶ 120, 122; 42 C.F.R. § 423.120.  Additionally, large plan sponsors allegedly compare between PBM networks with similar numbers of local pharmacy choices.  Id. ¶ 121.  "Therefore, choices available to local beneficiaries likely include

only a small number of suppliers: national PBM-owned mail-order facilities and a limited number of local pharmacies."  Id.

II.    Analysis

Defendants raise a litany of arguments in support their motion to dismiss.  These will be addressed as follows.

A.  Injunctive Relief

i.    Irreparable Harm

Defendants assert that Plaintiffs are not entitled to the injunctive relief that they seek. (Doc. 43 at 10).  First, they argue that Plaintiffs have failed to plead any injury that cannot be compensated with money damages.  Id. at 11.  While it is true that "a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement" for obtaining injunctive relief, Frank's GMC Truck Ctr., Inc. v. GMC, 847 F.2d 100, 102 (3d Cir. 1988), an exception exists in cases where "the potential economic loss is so great as to threaten the existence of the [Plaintiffs'] business."  Minard Run Oil Co. v. United States Forest Serv., 670 F.3d 236 (3d Cir. 2011) (quotes and citations omitted).  Plaintiffs provide plausible allegations that, if proven true, would allow a reasonable trier of fact to conclude that they would suffer exactly this form of harm from Defendants' merger – at least with respect to Plaintiffs' claims as sellers of pharmacy services.  See Part I.A., supra.  As such, this argument is unpersuasive as to those claims.

With respect to their claims as purchasers of PBM services, see (Doc. 43 at 12), Plaintiffs argue that their irreparable harm is based on "harm to competition through the destruction of a

competitor, thereby reducing the overall competitiveness of the market." (Doc. 49 at 22). As Plaintiffs are, as to this claim at least, direct purchasers of PBM services, any harm that they would suffer from the alleged loss of competition would be monetary in nature. This conclusion is bolstered by Plaintiffs' own factual allegations that they "will be harmed in their capacity as buyers of full-service, nationwide PBM services by price increases on these services and by Defendants' manipulation of their formulary to include more expensive branded drugs and Designated Specialty [D]rugs." (Doc. 1 ¶ 150). These allegations, if true, would lead to harm to the Plaintiffs that are purchasers of PBM services that is compensable by money damages. Accordingly, to the extent that Plaintiffs allege that they suffer competitive harm from Defendants' merger based on their status as purchasers of full-service, nationwide PBM services, their claim must be dismissed. Additionally, as Plaintiffs assert that they seek only injunctive relief, see (Doc. 1 at 46-47), it is clear that any leave to amend this claim would be futile, and will be denied.[8]

ii.    Timeliness of Filing

Defendants next argue that injunctive relief would be inappropriate in light of the fact that Plaintiffs did not file their complaint until late in the merger process. (Doc. 43 at 14). It is difficult to discern whether Defendants base this argument solely on the balance of hardships that must be considered in cases involving injunctive relief, or whether they are attempting to raise the equitable defense of laches as well. See id. Plaintiffs appear to interpret the motion to raise

---

[8] This analysis does not address Plaintiffs' claim regarding the harm that they would suffer as competitors to Defendants with respect to the provision of full-service nationwide PBM services to large employers. See (Doc. 1 ¶ 150). That claim will be addressed in Part II.B.iv of this order.

both arguments.  <u>See</u> (Doc. 49 at 5, 8).  Accordingly, and out of an abundance of caution, this

Court will do the same.

With respect to the balance of hardships, Defendants argue that the timing of Plaintiffs'

initiation of this case – which occurred merely four days prior to the consummation of the

merger – as well as their filing of a brief in support of a motion for temporary restraining order –

which was did not occur until after the merger had been consummated – tip the balancing test for

injunctive relief in Defendants' favor as a matter of law.[9]  (Doc. 43 at 14, 17).

---

[9]      Defendants have moved this Court to take judicial notice of several exhibits to establish a
timeline of the merger, "and when Plaintiffs had actual or constructive knowledge" of the same.
<u>See</u> (Doc 44 at 1-2); <u>see also</u> (Doc. 45 at 2).  Plaintiffs stipulate to the veracity of these
documents, but insofar as they establish that (1) the FTC informed Defendants that they would
not challenge their merger on March 30, 2012; (2) the FTC publically announced that they would
not opposed the merger on April 2, 2012; (3) on September 9, 2011, Plaintiffs announced their
intent to testify before Congress in opposition to the merger; and (4) Plaintiffs did so testify on
September 20, 2011.  (Doc. 50 at 2-3).  Plaintiffs oppose this motion to the extent that
Defendants move this Court to take notice of any factual findings contained in these documents.
<u>Id.</u> at 2-3.
        Additionally, Plaintiffs oppose judicial notice being taken of Defendants SEC filings,
arguing that Defendants have not explained "the facts or purposes for which they request judicial
notice."  <u>Id.</u> at 3; <u>see also</u> (Doc. 45 at 4-5).  However, reading Defendants' motion in its entirety,
and noting that they explicitly disavow any attempt to submit these documents "to prove the
truth of any statements set forth [therein][,]" this Court construes Defendants' purpose as simply
to establish the dates on which these forms were filed with the SEC.  Additionally, this Court
notes, with some irony, that Plaintiffs rely on at least some of the information contained in these
filings as the basis for their opposition to Defendants' laches argument.  <u>Compare</u> (Doc. 49 at 6)
("[Defendant] ESI announced on March 28, 2012, that it expected to close as early as the week
of April 2, 2012 . . .") (emphasis omitted) with (Doc. 44-6 at 3), which was dated
March 28, 2012 ("[Defendant] Medco now expects the parties may be in a position to close the
transaction as early as the week of April 2, 2012").
        Rule 201(b) of the Federal Rules of Evidence allows a court to take judicial notice of,
<u>inter alia</u>, a fact that "can be accurately and readily determined from sources whose accuracy
cannot reasonably be questioned."  However, from the briefs submitted in this matter, it is clear
that the parties agree on the timeline – at least insofar as it can be established by the documents
provided by Defendants – making the judicial notice of these facts unnecessary.  Accordingly,
Defendants' motion to take judicial notice (Doc. 44) will be denied as moot, and this Court will
adopt the parties' agreed-upon timeline.

Defendants rely heavily on Ginsburg v. InBev NV/SA, in which the Court of Appeals for the Eighth Circuit determined that the dilatory content of the plaintiffs in that case precluded the equitable remedy of divestiture as a matter of law.  623 F.3d 1229, 1236 (8th Cir. 2010).  In that case, the plaintiffs filed their initial complaint on September 10, 2008, but did not seek a preliminary injunction until November 3, 2008 – and then only at the direction of the district court several days earlier.  Id. at 1231, 1235.  Adding to the egregiousness of plaintiffs' delay was the fact that they had been informed by the defendants on October 6, 2008, that the merger could be consummated as early as November 12, 2008.  Id. at 1231.  Emphasizing this timeline, as well as plaintiffs' status as indirect purchasers, and noting the speculative nature of their claims, the court of appeals determined that, even if the equitable doctrine of laches might not be appropriate, the hardship that defendants would suffer due to divestiture was "dramatic and certain[,]" which preluded the equitable relief that the plaintiffs sought.[10]  Id. at 1235-36.

As Plaintiffs correctly argue, the facts of the instant case are not the same as those in Ginsburg.  While Plaintiffs did wait to file this suit until long after they knew about the existence of Defendants' proposed merger, it is clear from the facts alleged in the complaint – which must be taken as true for the purposes of this motion – as well as from the timeline agreed-upon by the parties – that Plaintiffs filed their complaint on the day following Defendants' announcement that the merger was imminent.  See (Doc. 1 ¶ 75); see also (Doc. 49 at 6).  Their motion for temporary restraining order was filed the day after, and while it was not perfected with a brief

---

[10] The court of appeals also took note of the parallel antitrust action that had been filed by the United States in the District Court of the District of Columbia, which resulted in defendants consenting not to enter the market for the sale of beer in the United States de novo.  Ginsburg v. InBev NV/SA , 623 F.3d 1229, 1232 (8th Cir. 2010).

until the date of the consummation of the merger, that was due less to Plaintiffs' dragging its

heels after filing suit, and more to the speed with which Defendants completed their merger.

To the extent that Defendants argue that Plaintiffs' filing at so late a point in the merger

process was inexcusable, Plaintiffs counter that any suit filed prior to approval by the FTC would

have failed under the ripeness doctrine.  (Doc. 49 at 5-6).  Indeed, as the Court of Appeals for the

Seventh Circuit has recognized, such suits can be premature "until all required state and federal

approvals have been obtained – for the agencies might insist on changes that would substantially

alter the merger's competitive effects."  S. Austin Coalition Cmty. Council v. SBC Commc'ns,

Inc., 191 F.3d 842, 843, 844-45 (7th Cir. 1999); see also AT&T Mobility LLC v. Smith, No.

11-cv-5157, 2011 WL 5924460, *9-*10 (E.D. Pa. Oct. 7, 2011) (citing S. Austin as support for

enjoining private arbitration attacking a merger during the pendency of a civil suit filed by the

Department of Justice in which violations of Section 7 of the Clayton Act were alleged).

In the end, given the factual allegations in the complaint, as well as the timeline agreed-

upon by the parties, it is impossible for this Court to say that the timing of Plaintiffs' acts was so

late, or that the balance of equities favor Defendants to such a degree, that Plaintiffs are

precluded from seeking divestiture as a matter of law.

For the same reasons, it would be inappropriate to dismiss the complaint based on the

equitable defense of laches.  The determinations of the components of the laches defense –

inexcusable delay in bringing an action and prejudice to the defendant – are highly fact-based.

See Cyberworld Enter. Techs., Inc. v. Napolitano, 602 F.3d 189, 200 (3d Cir. 2010); see also

Morgan v. Sharon Bd. of Educ., 472 F. Supp. 1157, 1160 (D.C. Pa. 1979).  Here, neither of the

above factors is apparent from the face of the complaint or the timeline to which the parties have

agreed.  Accordingly, the timing of the filing of the complaint and Plaintiffs' motions for TRO

does not provide an adequate basis on which to dismiss this action.


B.  Antitrust Standing and the Relevant Markets

The existence of antitrust standing is a judicially-devised requirement that is meant to

ensure that "the plaintiff is a proper party to bring a private antitrust action."  Assoc'd Gen.

Contractors of Cal. v. Cal. State Council of Carpenters, 459 U.S. 519, 535 n.31.  It is "somewhat

different" than constitutional standing, see Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992),

and requires a court to engage in an examination of "the plaintiff's harm, the alleged wrongdoing

by the defendants, and the relationship between them.  Id. at 535 and 535 n.31.  Five factors

generally are considered when determining whether a party has antitrust standing in a claim for

damages:

> (1) the causal connection between the antitrust violation and the
> harm to the plaintiff and the intent by the defendant to cause that
> harm, with neither factor alone conferring standing; (2) whether
> the plaintiff's alleged injury is of the type for which the antitrust
> laws were intended to provide redress; (3) the directness of the
> injury, which addresses the concerns that liberal application of
> standing principles might produce speculative claims; (4) the
> existence of more direct victims of the alleged antitrust violations;
> and (5) the potential for duplicative recovery or complex
> apportionment of damages.

City of Pittsburgh v. West Penn Power Comp., 147 F.3d 256, 264 (3d Cir. 1998) (citations and

footnote omitted).  However, in spite of Defendants' arguments to the contrary, the Supreme

Court has recognized that the "[antitrust] [s]tanding analysis under § 16 [for injunctive relief]

will not always be identical to standing analysis under § 4 [for damages]."  Cargill, Inc. v.

Monfort of Colorado, Inc., 479 U.S. 104, 111 n.6 (1986).  The standard for antitrust standing

where, as here, a plaintiff seeks injunctive relief under Section 16 of the Clayton Act is less

demanding, and requires simply the demonstration of (1) a significant "threatened loss or injury

cognizable in equity;" which (2) "proximately result[s] from the alleged antitrust injury."  In re

Warfarin Sodium Antitrust Litig., 214 F.3d 395, 399-400 (3d Cir. 2000); Sullivan v. DB Invs.,

Inc., 667 F.3d 273, 316-17 (3d Cir. 2011) (en banc) (noting that Section 16 of the Clayton Act

"has been applied more expansively, both because its language is less restrictive than that of

§ 4 . . . and because the injunctive remedy is a more flexible and adaptable tool for enforcing the

antitrust laws than the damage remedy. . .") (internal quotes and citations omitted).[11]  See also

Delco LLC v. Giant of Maryland, LLC, No 07-3522, 2007 WL 3307018, at *8 (D.N.J. Nov. 8,

2007).  This standard still necessitates that a plaintiff seeking injunctive relief under Section 16

show that whatever injury it alleges is "of the type the antitrust laws were designed to prevent."

Cargill, 479 U.S. at 111; see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477,

489 (1977).  "As a general matter, the class of plaintiffs capable of satisfying the antitrust-injury

requirement is limited to consumers and competitors in the restrained market and to those whose

injuries are the means by which the defendants seek to achieve their anticompetitive ends."  W.

Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 102 (3d Cir. 2010) (citations omitted).

Even if a plaintiff has suffered an injury-in-fact due to a violation of antitrust laws, if it is not of

---

[11] The Court of Appeals for the Third Circuit in Sullivan articulated the standard for antitrust
standing when only injunctive relief is sought in slightly different terms – stating that "to
establish the need for injunctive relief, plaintiffs must generally demonstrate three uncomplicated
prerequisites: 'a threat of loss'; that the injury in question 'is of the type the antitrust laws were
intended to prevent'; and 'a significant threat of injury from a violation of the antitrust laws.'"
Sullivan v. DB Invs., Inc., 667 F.3d 273, 317 (3d Cir. 2011) (en banc) (quoting In re Warfarin
Sodium Antitrust Litig., 214 F.3d 395, 399 (3d Cir. 2000)).  However, this standard, even if
phrased differently than the one articulated above, is taken from the same underlying case, and
both are identical.

this recognized type, there is no standing to proceed in a private antitrust action.  Barton &
Pittinos v. Smithkline Beecham Corp., 118 F.3d 178, 181 (3d Cir 1997).

Additionally, an analysis of the potential anticompetitive effects of Defendants' merger
cannot be completed without a proper definition of the markets in which those alleged effects
will manifest.  Accordingly, Plaintiffs must provide sufficient allegations of fact to set forth the
contours of the product and geographical markets relevant to their claims.  See Brown Shoe Co.
v. United States, 370 U.S. 294, 325 (1962).  "The outer boundaries of a product market are
determined by the reasonable interchangeability of the use or the cross-elasticity of demand
between the product itself and the substitutes for it."  Id.  The relevant geographical market
alleged by Plaintiffs must "correspond to the commercial realities of the industry and be
economically significant."  Id. at 336-37.

Plaintiffs bear the burden of defining the relevant market.  Queen City Pizza, Inc. v.
Domino's Pizza, Inc. 124 F.3d 430, 436 (3d Cir. 1997) (citations omitted).  "[I]n most cases,
proper market definition can be determined only after a factual inquiry into the commercial
realities faced by consumers."  Id. (citing Eastman Kodak Co. v. Image Tech. Servs., Inc. 504
U.S. 451, 482 (1992)); see also Brown Shoe, 37 U.S. at 336.  However, in cases where a
plaintiff's allegations regarding the relevant market are facially insufficient, dismissal may be
granted based on that deficiency.  Queen City Pizza, 124 F.3d at 436.

        i.      Sale of Clinical Specialty Drugs

Defendants first attack Plaintiffs' standing to bring claims with respect to the sale of
specialty drugs.  (Doc. 43 at 21).  They characterize Plaintiffs' alleged injuries as arising not
from possible anticompetitive effects of the merger, but from "cost savings and other

efficiencies" resulting from "too much competition."  Id. at 21 and 22. (internal quotes, citation, and emphasis omitted).  Additionally, Defendants assert that courts take a skeptical view of antitrust claims brought by competitors.  (Doc. 43 at 21) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582-83 (1986)).[12]

The crux of Defendants' argument is that Plaintiffs' claims are like those in Cargill.  In that case, the Supreme Court addressed allegations that a merger between the petitioners would result in a "price-cost 'squeeze' that that would severely narrow [the respondent's] profit margins[.]"  479 U.S. at 108 (internal quotes omitted).  This would be accomplished by petitioners' lowering of its prices "to some level at or slightly above its cost in order to compete with other[s] for market share[,]" which was feasible due to petitioners' "multi-plant efficiencies[.]" Id. at 114-15.  The Court held that any injuries that would result from this alleged plan, which it characterized as "vigorous competition" for market share, simply were not of the type, against which antitrust laws were designed to protect.  Id. at 116-117.

Plaintiffs, however, do not allege injury merely based on increased efficiencies or competition.  Instead, they allege that merged Defendants will use their increased market power to force consumers away from Plaintiffs' specialty pharmacy businesses, and into their own mail-order and in-house specialty pharmacies.  (Doc. 1 ¶¶ 3, 23, 139, 140).  The anticompetitive acts alleged by Plaintiffs would include forcing patients to use Defendants' specialty pharmacy – regardless of the patient's wishes – by denying claims for specialty drugs purchased in any other

---

[12] To the extent that such skepticism would be warranted here, it would be not dispositive of a motion to dismiss, despite Defendants' implications to the contrary,.  See, e.g., W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 102 (3d Cir. 2010) (citations omitted).

manner.  Id. ¶¶ 139-40.  As a result, Defendants' argument that Plaintiffs allege injury with

respect to this claim based merely on "too much competition" is unpersuasive.

Next, Defendants argue that Plaintiffs have not alleged an adequately specific product

market for Clinical Specialty Drugs, have not sufficiently differentiated them from Designated

Specialty Drugs, and have not provided allegations of undue concentration in this market.  (Doc.

43 at 23-24, and 24 n.7).  In response, Plaintiffs point to the portions of the complaint in which

the term "Clinical Specialty Drugs" is defined, and differentiated from the definition of

"Designated Specialty Drugs."  See (Doc. 49, at 17-18); see also Part I.B, supra.  While it is true

that Plaintiffs do not provide the specific names of those drugs that qualify as Clinical Specialty

Drugs, the definition that they do provide – namely "drugs that should be dispensed and

managed through a specialty pharmacy because they require specialized storage, control and

security, handling, administration, and patient monitoring . . ." see (Doc. 1 ¶ 91), is sufficient, at

this stage in the litigation, as are Plaintiffs other allegations concerning the product market for

Clinical Specialty Drugs.


      ii.     Provision of Retail Pharmacy Services

Defendants next attack Plaintiffs' standing as suppliers of retail pharmacy services,

arguing that Plaintiffs have not alleged that they will suffer a reduction in output, which is

required for monopsony claims.  (Doc. 43 at 25) (citing In re Beef Indus Antitrust Litig., 907 F.2

510, 516 (5th Cir 1990)).  To the contrary, Plaintiffs provide numerous factual allegations that

the lowered reimbursement rates that will be paid by Defendants due to their increased economic

power post-merger will result in lowered output of pharmacy services, and reduced quality of the

services that will continue to exist.  See (Doc. 1 ¶¶ 134-36).  However, Plaintiffs allege that this

injury will come about due to the lowered reimbursement rates that they expect to receive from the merged entity.  They specifically rely on West Penn, in which the Court of Appeals for the Third Circuit determined that allegations of reduced reimbursement rates paid by an alleged monopsonist health insurance company could lead to "suboptimal output, reduced quality, allocative inefficiencies, and . . . higher prices for consumers in the long run."  627 F.3d at 104; (Doc. 49 at 11-12).  What Plaintiffs omit from their argument is that the court in West Penn specifically based their finding of antitrust injury on allegations of conspiracy between two independent defendants to force lowered reimbursement rates on the plaintiff in that case – an act that that court characterized as "inherently . . . fraught with anticompetitive risk . . . ."  W. Penn, 627 F.3d at 103.  Indeed, that court went on to say that, had the same lowered reimbursement rates been paid by insurance company unilaterally, the plaintiffs would have had "little basis for challenging [them]."  Id.  Based on this reasoning, Plaintiffs have failed to allege a cognizable antitrust injury with respect to this claim, and it will be dismissed.  However, based on Plaintiffs' pleadings, it is unclear whether it would be futile to grant leave to amend.[13]  Accordingly, dismissal of this claim will be without prejudice.

---

[13] Plaintiffs do allege that, if Defendants adopted "non-competitive, or even below-cost prices" they would be forced to do business with them anyway.  See, e.g., (Doc. 1 ¶ 37); see also id. ¶ 130 (referencing reimbursement rates "below competitive levels[.]"  However, these allegations are never fully fleshed out in the complaint as to the sort of anticompetitive acts in which they expect the merged Defendants to engage.  Indeed, in their prayer for relief, Plaintiffs assert that Defendants' merger would result reimbursement rates that would decline to a "suboptimal level[,]" which is a nebulous term at best.  Id. ¶ 162.e.  In the end, Plaintiffs appear the base their arguments for antitrust injury in this case on mere depressed reimbursement rates, see (Doc. 49 at 11-12), which, for the reasons stated above, is insufficient to confer antitrust standing on them with respect to this claim.

iii.     Provision of Drugs to Beneficiaries of Large Employer Drug Plans

Next, Defendants attack Plaintiffs' claims related to the provision for drugs to beneficiaries of large plan sponsors in local markets.  (Doc. 43 at 27).  While Defendants assert that it is unclear whether Plaintiffs claim to be competitors or suppliers in this market, id., the complaint makes reference only to Plaintiffs' competition with Defendants' mail-order and specialty pharmacy services.  See (Doc. 1 ¶¶ 118-122).  Additionally, Plaintiffs raise arguments only with respect to competition in this market in their response to the motion to dismiss.[14] (Doc. 49 at 14-15).  As such, this Court interprets this claim to be raised by Plaintiffs as competitors of Defendants in this field.

Defendants' arguments concerning Plaintiffs' antitrust standing to raise this claim clearly are based on the theory that Plaintiffs are proceeding as suppliers.  See generally, (Doc. 43 at 28).  They are unpersuasive with respect to Plaintiffs' claims as competitors.

Defendants also attack the product market associated with this claim.  Plaintiffs provide no reason why the provision of drugs to the beneficiaries of large private employers differs in any way from the provision of drugs to the beneficiaries of smaller employers, or to the public at large.  While it is true that a particular submarket can provide an acceptable definition for a relevant product market, see Brown Shoe, 370 U.S. at 325, a plaintiff cannot permissibly narrow a market to a specific group of consumers without explaining the difference in the product supplied to those consumers.  See id. at 326; see also Invacare Corp. v. Respironics, Inc., No. 1:04 CV 1580, 2006 WL 3022968, at *6 (N.D. Ohio, Oct. 23, 2006).  Plaintiffs have failed to do so with respect to this claim.  Indeed, the portions of the complaint to which they cite –

---

[14] To the extent that Plaintiff is attempting to raise claims as a supplier of drugs to Defendants in this market, such claims must be dismissed, given Plaintiffs' lack of factual allegations supporting them.

paragraphs 104, 110, and 114 – are recited explicitly in support of Plaintiffs' claims regarding the provision of full service, nationwide PBM services to large private employers, and the allegations contained therein seem wholly inapplicable to the instant legal claim.  Accordingly, this claim will be dismissed.  However, as Plaintiffs request leave to amend, and it does not seem that the grant of leave necessarily would be futile, dismissal of this claim will be without prejudice.

      iv.     <u>Full-Service Nationwide PBM Services to Large Private Employers</u>

Finally, Defendants attack Plaintiffs' claims with respect to the provision of nationwide PBM services.  (Doc. 43 at 3).  Defendants first attack Plaintiffs' standing under Article III, noting that, while Plaintiffs allege that they are harmed as consumers of these services, they do not identify a single member who qualifies as a large private employer.  <u>Id.</u>  While Plaintiffs' claims as consumers of full-service nationwide PBM services rendered to large private employers was addressed in Part II.A.i, <u>supra</u>, the issue of Article III standing is equally applicable to Plaintiffs' claims as competitors in this market, and is properly raised by this Court <i>sua sponte</i>.  <u>See</u> <u>Addiction Specialists v. Twp. of Hampton</u>, 411 F.3d 399, 405 (3d Cir. 2005).

Plaintiffs provide no indication that they are competitors in this market other than that unspecified members of the "Associations" tried and failed to enter the market in the recent past.  (Doc. 1 ¶ 115).  Given that at least two Plaintiffs could be referred to by the term "Association," it is impossible to determine, based on the allegations of fact in the complaint, which Plaintiff, if any, has a member that allegedly is injured by Defendants' acts with respect to this product market.  Article III standing requires a showing of injury to a plaintiff, <u>see</u> <u>Friends of Earth, Inc. v. Laidlaw Environ. Servs. (TOC), Inc.</u>, 528 U.S. 167, 704 (2000), and it is impossible to

determine whether plausible allegations of such injury exist if the complaint fails to identify a single plaintiff who claims to be so injured.  See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (a complaint must be dismissed even if the claim to relief is "conceivable," because a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face").  Accordingly, this claim will be dismissed for lack of Article III standing.  However, leave to amend this claim would not be futile, and dismissal will be without prejudice.

AND NOW, this 27th day of August, 2012,

IT IS HEREBY ORDERED that, for the reasons stated above, Defendants' motion to dismiss (Doc. 42) is GRANTED with prejudice in part, GRANTED without prejudice in part, and DENIED in part.  Plaintiffs' claims will be disposed of in the following manner:

1.   Plaintiffs' claims involving the provision of retail community pharmacy services, as competitors for the provision of drugs to the beneficiaries of large employers, and as competitors in the market for the provision of full-service, nationwide PBM services to large private employers are DISMISSED without PREJUDICE. Plaintiffs shall, if appropriate, file an amended complaint with respect to these claims on or before September 10, 2012.  Failure to amend within this period of time will result in the dismissal of these claims with prejudice.

2.   Plaintiffs' claims made as purchasers of full-service, nationwide PBM services, and as suppliers in the market for the provision of drugs to the beneficiaries of large employers are DISMISSED with PREJUDICE.

3.   Plaintiffs' claim regarding the sale of Clinical Specialty Drugs survives.

IT IS FURTHER ORDERED that Defendants' motion to take judicial notice (Doc. 44) is DENIED as moot.

BY THE COURT:

s/Cathy Bissoon
CATHY BISSOON
UNITED STATES DISTRICT JUDGE

cc (via CM/ECF):
All Counsel of Record